UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter K. FISCHER and Gregory Stueve,
Defendants-Appellants.

No. 75–3251.

United States Court of Appeals,
Fifth Circuit.

May 17, 1976.
Rehearing Denied June 22, 1976.

---

P. D. Aiken, Ft. Lauderdale, Fla., for Fischer.

Raymond W. Russell, Ft. Lauderdale, Fla. (Court appointed), for Stueve.

Robert W. Rust, U. S. Atty., Robert L. Andrews, N. Jerome Sanford, Asst. U. S. Attys., Miami, Fla., Kerry J. Nahoom, Asst. U. S. Atty., Ft. Lauderdale, Fla., for plaintiff-appellee.

Before COLEMAN, RONEY and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge.

In a jury trial, both appellants were convicted of (1) conspiracy to possess and distribute cocaine (2) possession with intent to distribute the cocaine, and (3) distribution of the cocaine [1]. Motions for a new trial were denied by the district court, and appellants were sentenced to periods of confinement and to additional special parole terms. Appellants raise a number of issues before this Court, two of which require us to reverse their convictions and remand for a new trial.

I

The evidence presented by the government at trial tended to show the following. On the evening of October 2, 1974, two undercover agents went with a confidential informant to a residence in Fort Lauderdale, Florida, where they were introduced to appellant Stueve. Stueve offered to sell the agents a quantity of cocaine. The agents took a sample of the alleged cocaine and conducted two field tests. The first of

---

[1]. These acts are criminal offenses under Title 21, U.S.C. Section 841(a)(1) (distribution of a controlled substance, and possession of a controlled substance with intent to distribute) and Title 21, U.S.C. Section 846 (conspiracy to commit offenses defined in Title 21, United States Code, Chapter 13, Subchapter 1).

these, using a cobalt reagent, established that the substance was, in fact, cocaine. The second test was designed to give a rough measure of the cocaine's purity. A glass of clorox was obtained, and the informant (under instructions from one of the agents) scraped some of the cocaine from a shaving mirror into the glass. The agents watched the substance filter through the clorox and asked Stueve some questions about the quality of the sample which they had been given. They professed their unwillingness to pay Stueve's asking price ($1,250 an ounce) for inferior cocaine. Stueve assured them that, if they weren't satisfied with the sample which he had offered, he could obtain pure cocaine for them from another source. The agents expressed an interest in this proposal, and plans were made for the agents to call back on the following day. One agent, John King, left with a small amount of the cocaine, saying that he would conduct further tests to determine its exact quality.

Agent King telephoned Stueve just after noon the next day. He said that further analyses of the sample had shown the cocaine to be of inferior quality. Stueve apologized, and renewed his promises that he would be able to obtain a portion of an incoming shipment of pure cocaine. Arrangements were then made for the parties to meet in a local bar that night. At this meeting, Stueve introduced the agents to his partner, the appellant Fischer, who immediately apologized for the inferior sample and backed up Stueve's assurances that a shipment of pure cocaine was on the way. Negotiations ensued, primarily concerning the price and quality of the new shipment.

The parties agreed to keep in touch. Their third and final meeting was on the evening of October 10, 1974, at another bar in Fort Lauderdale. Appellants represented to the agents that the shipment was imminent, but that the cocaine would cost at least $1,500 an ounce. A heated argument arose about the sales price, and the parties were unable to close a deal. The meeting ended abruptly, when Fischer happened to notice an unmarked police vehicle outside the bar and communicated this fact to Stueve. Both appellants then left the premises, and thereafter appellants refused to speak to the agents when they called.

The defense was that the alleged narcotic transactions never took place. Appellants did not testify. However, Sandy Cardozo and Georgette St. Pierre, both of whom were present at the October 2 meeting, stated that no incriminating conversations took place that evening and no cocaine changed hands. Both women purported to recall numerous details of the evening in question, including the clothing worn by the various participants. In particular, the witnesses said that Agent King was wearing a sports jacket with patches on the sleeves. The truth of these witnesses' alleged recollections immediately became the major issue in the case. The government vigorously sought to create the impression that the two women were lying[2]. On rebuttal, the prosecutor called King, his wife, and his aunt to testify that the patches had not been sewn on the jacket until December of 1974. Witness credibility was the dominant theme of each closing argument, with great stress being laid upon the clothing-identification issue[3]. Also, as shall appear, *infra*,

---

2. These attempts to cast doubt upon the witnesses' credibility did not always remain within the bounds of propriety. An objection was sustained to the following cross-examination of Mrs. St. Pierre:

"Q. And you appreciate the significance of being under oath here today?
A. Yes, I do.
Q. And, of course, you wouldn't lie about any of your testimony, would you?
A. No, I would not.
Q. Certainly not about patches being on a jacket?
A. No. No.

Q. It's not nice for little girls to lie in court —"

Trial Record, at p. 324.

3. Government counsel's comments on the defense witnesses included the following:

"They sat there during the entire Government's case and they hung themselves. Why is it important to have that coat? It's very obvious. One word—"patches"—destroyed two witnesses . . . Bold face, brazen,

the trial court chose to comment to the jury on the witnesses' testimony. After deliberating for several hours, the jury returned verdicts of guilty on all counts against both appellants.

## II

During the government's rebuttal, the trial court made the following remarks to counsel at sidebar:

> Let me tell you something, gentlemen. I am confident that young lady that got on the stand yesterday was lying under oath. Out and out bald-face lies. People do not remember what everyone was wearing at an uneventful occasion eight months earlier. Most of us can't remember what color tie we have got on, without looking at it. Remember what you wore a week ago Tuesday—nobody can  .  .  .

Trial Record, at p. 335.

Immediately thereafter, when the rebuttal witnesses had finished testifying, the judge announced to counsel that he might comment on the evidence.

> I might point out this is Federal Court and I have a right to comment on the evidence and I may do so in this case. I ordinarily do not do so. Where I feel that there may have been deliberate falsehoods told in this courtroom, I very definitely have the right to comment on that.

Trial Record, at p. 345.

Defense counsel then requested that, if the court should comment on the evidence, the standard jury instruction be given which defines the limited role of such comments and emphasizes that the jury is not bound by what the judge says [4]. The court refused to do so, stating: "I never heard of instructing the jury on the right of a Federal Judge to comment on the evidence. It's a right we have, sir." Trial Record, at p. 347. The culmination of these events came

when the trial judge, after announcing "The Court is now going to charge you on the law," included the following remarks in his instructions:

> I feel constrained to point out that someone obviously didn't tell the truth from the witness stand in this case. Use your own common sense to aid you in determining who did and who didn't. Consider, if you can remember what you wore a week ago Tuesday, let alone what everyone in the room wore eight months ago when you had no reason to remember such details.

Trial Record, at p. 384.

We agree with appellant that this instruction, when viewed in the context of the entire case, was an improper comment upon the credibility of the defense witnesses. It has long been recognized that a district judge may explain and comment upon the evidence in his instructions to the jury. See *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321, 1324 (1933). However, of equally long standing is a significant limitation upon that right. Because of the great influence which the trial judge necessarily exerts upon the jury, the court must exercise the most scrupulous care to avoid giving an unfair or one-sided impression. *Id.* at 470, 53 S.Ct. at 699, 77 L.Ed. at 1325; *Starr v. United States*, 153 U.S. 614, 625–26, 14 S.Ct. 919, 923, 38 L.Ed. 841, 845 (1894). This limitation was not observed in the present case. Here, as in *United States v. Cisneros*, 491 F.2d 1068 (5th Cir. 1974), the essential testimony of the two sides was in "stark, irreconcilable conflict", *id.* at 1075. Indeed, the government has conceded that "the credibility of the witnesses was squarely presented as the decisive issue." Brief of Appellee, at p. 6. We feel that, as in *Cisneros*, the trial judge's comments below unduly trespassed upon the jury's function of determining the credibility of witnesses.

---

4. See, e. g., Vol. I, Devitt & Blackmar, *Federal Jury Practice and Instructions*, Section 10.08 (2d ed. 1970) ("Court's Comments on Evidence"); McBride, *The Art of Instructing the Jury*, Section 4.44 ("Comment on the Evidence").

---

are the only words that can be used to describe the two witnesses produced by the defense."

Trial Record, at p. 378.

The truth of the defense witnesses' recollections of the evening of October 2 became the central factual issue in the trial as soon as these witnesses testified. This testimony was crucial to appellants' defense, and, in fact, was virtually the only defense they had. Both during the witnesses' testimony and in his argument to the jury, the prosecutor accused the defense witnesses of lying. The trial court's remarks clearly adopted the prosecution's view of this matter and rejected that of the defense. No amount of strained interpretation can transform this comment into anything other than a direction that "common sense" should lead the jury to disregard the defense witnesses' testimony. Such judicial invasion of the jury's province is particularly inappropriate in a case like this one. As we said in *Cisneros, supra,* at 1075:

> Underscoring the importance of the credibility issue was the probable unequal position from which the witnesses began in the minds of the jurors—on the one hand, a police officer, on the other hand two apparent denizens of the nether world of street dope.

These words could easily have been written about the present case. We hold that the trial judge's remarks constituted reversible error [5].

## III

We also find error in the court's handling of appellants' repeated *motions to* compel disclosure and production of the confidential informant. Since *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it has been recognized that such a motion requires the trial court to balance the benefits of disclosure and production for the defendants against the resulting harm to the government. *Id.* at 62, 77 S.Ct. at 628, 1 L.Ed.2d at 646. The proper ruling will depend upon the specific facts and circumstances of each individual case. *Id.; United States v. Toombs,* 497 F.2d 88, 92 (5th Cir. 1974). Therefore, the courts have not attempted to formulate a blanket rule for cases like this one, although several broad categories can be discerned in the published decisions. At one extreme are those cases where the informant was a mere tipster. It is settled that the *Roviaro* principle does not require disclosure and production of such an informant. See, e. g., *Bourbois v. United States,* 530 F.2d 3 (1976); *United States v. Clark,* 482 F.2d 103, 104 (5th Cir. 1973). At the other extreme are cases such as *Roviaro* itself, in which an informer has played a crucial role in the alleged criminal transaction, and disclosure and production of the informer are required to ensure a fair trial. Examples of such cases in this circuit include *United States v. Jiminez-Serrato,* 451 F.2d 523, 526 (5th Cir. 1971) (informer was the only participant in transaction who could establish defendant's *mens rea* ); *Portomene v. United States,* 221 F.2d 582, 583–84 (5th Cir. 1955) (in pre-*Roviaro* case, informer was the one who actually purchased narcotics from the defendant). Still another group of cases is typified by *United States v. Toombs, supra,* in which there was a slight possibility that the defendant might benefit from disclosure, but the government had demonstrated a compelling need to protect its informer. On the record before this Court, we are unable to determine the category in which the present case should be placed. This informer was clearly more than a mere tipster. He arranged the parties' introduction, was pesent throughout the October 2 meeting, and conducted a field test at the behest of one of the undercover agents. Thus, his participation was more active and significant than that of the informer in *United States v. Davis,* 487 F.2d 1249 (5th Cir. 1973). On the other hand, we are unable to conclude from this record that the informer's participation was such that

---

**5.** It is unnecessary for us to decide whether the court's refusal to give the requested instruction concerning comments on the evidence might by itself justify reversal. For the guidance of the district courts, though, we wish to call attention to the rule in this circuit that "if the trial judge chooses to comment on the evidence, he must instruct the jury that they are not bound by his comments or questions." *United States v. Jacquillon,* 469 F.2d 380, 387 (5th Cir. 1972); *United States v. Musgrave,* 444 F.2d 755, 762 (5th Cir. 1971).

fairness to the defendant would require disclosure and production regardless of any showing the government could make in opposition. We can only guess as to the substance of the testimony which this informer would give. Also, the record is silent about the interests which the government may have in resisting disclosure and production. Under the circumstances, we feel that an *in camera* hearing will best accommodate the competing governmental and individual interests in this case. See *United States v. Doe*, 525 F.2d 878 (5th Cir. 1976); *United States v. Freund*, 525 F.2d 873 (5th Cir. 1976). Upon remand, the district judge should question the informer *in camera* to ascertain whether his testimony might be helpful to the defendants. The informer and government counsel should also be questioned concerning the interests which the government may have in resisting disclosure and production. The record shall then be supplemented with an order which applies the *Roviaro* balancing test to the facts of this case. See *Freund, supra*, at 878.

REVERSED and REMANDED, with directions.