Jose R. SUAREZ, Jr., and Virginia Peters Suarez, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 78–1115
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Oct. 27, 1978.

Rehearing Denied Dec. 1, 1978.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Jerome S. Richman, Miami, Fla., for plaintiffs-appellants.

Jack V. Eskenazi, U. S. Atty., Miami, Fla., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Crombie J. D. Garrett, Carleton Powell, John Dudeck, Jr., Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before BROWN, Chief Judge, COLEMAN and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Dr. Jose Suarez, Jr. and his wife Virginia P. Suarez brought suit seeking the refund of the wagering occupational tax and that portion they had paid of the wagering excise tax assessed against them for their acceptance of lottery wagers between September 1972 and April 22, 1973. The Government counterclaimed for the total amount of unpaid assessments. After trial to a jury, the District Court entered judgment for the Government on its counterclaim in the amount of $54,444.56, plus interest and penalties. Jose and Virginia Suarez have appealed this judgment, which we affirm.

The sole issue on this appeal is whether the District Court erred in denying the motion of the taxpayers to compel discovery of the identity of a confidential informant, or alternatively, to conduct an *in camera* proceeding with regard to the confidential informant. Appellant taxpayers claim that disclosure of the confidential informant was essential to a fair determination of their tax liability. We hold that in the circumstances of this case, neither disclosure of the informant's identity nor an *in camera* proceeding was required under the principles of *Roviaro v. United States*, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, and its progeny in this Circuit.

### Taxing The Wages Of Wagers

On September 12, 1972, Florida police officers received information that lottery tickets were being delivered to Dr. Suarez. The police then placed the appellants under surveillance and on a number of occasions between September 13 and October 28 observed them engaged in activities relating to a lottery operation. For example, on several weeknights on which collecting and tallying of lottery results is commonly conducted in the Dade County, Florida area, appellants were observed to drive to various locations, meet with known gamblers, pick up brown paper bags (the receptacles traditionally used to transmit lottery tickets),[1] and take the bags to their house. For four months after October 28, however, periodic surveillance failed to detect any obvious activity pertaining to a lottery counting house operation. During the same period, inquiries made to confidential informants as to the lottery activities of the Suarezes failed to elicit any conclusive incriminating information.

On March 16, 1973, a confidential informant told a Sergeant Boyd of the Dade County Public Safety Department that, as subsequently recounted by Sergeant Boyd, "Jose Suarez is *again* operating a lottery counting house in Dade County, using several different locations to count the lottery" (emphasis added). The confidential informant reportedly had obtained this information by placing lottery wagers and holding conversations with persons involved in the Suarez lottery operation. The police increased their surveillance of appellants and on several occasions between March 24 and April 15 again observed them involved in activities associated with the collection and tallying of lottery wagers.

The police secured search warrants for the Suarez residence and another location which Dr. Suarez had frequented during the April surveillance. Raids of both locations were conducted on April 22, as a result of which the police seized 16 lottery summary sheets showing winning numbers and gross receipts for prior lotteries as well as adding machines, note pads with lottery notations, and other gambling paraphernalia. Shortly after the raid, Dr. Suarez admitted that he was a "banker" in a lottery operation and that his associate was one of the men the police had observed Suarez to meet during their September surveillance.

Upon learning of the raid, the Internal Revenue Service commenced an investigation into appellants' liability for the federal excise tax on wagers. Relying on the lottery summary sheets seized in the raids, which were connected with winning lottery numbers for dates during February, March, and April of 1973, the IRS reconstructed appellants' gross wagers and assessed the appellants for wagering excise taxes going back to September 1972 when surveillance first indicated their operation of a lottery counting house. The appellants admitted some liability for wagering excise taxes for February through April 1973, but denied that they were associated with any lottery operations prior to February 1973.

Appellants paid a portion of the taxes assessed, but then filed claims for refund and brought this action, with the Government counterclaiming for the balance. During pre-trial discovery, appellants took the deposition of Sergeant Boyd who had participated in the surveillance of appellants' lottery activities and whose affidavits formed the basis for the issuance of the search warrants. At this deposition appellants sought the identity of the confidential informant who, on March 16, 1973, had informed Sergeant Boyd that "Jose Suarez is *again* operating a lottery counting house" (emphasis added). Sergeant Boyd refused to reveal the identity of the confidential informant, citing as his reason that the informant had supplied information pertaining to numerous illegal lottery operations and that his physical well-being might be endangered by disclosure of his identity. Appellants moved to compel discovery of the informant's identity or, in the alternative, to conduct an *in camera* hearing to determine whether the informant could pro-

---

1. See *Pinder v. United States*, 5 Cir., 1964, 330 F.2d 119, 122.

vide testimony relevant to the period during which they were engaged in a lottery operation. The District Court denied the motion.

After a two-day trial, the jury returned a special verdict, finding that Jose and Virginia Suarez had engaged in the business of accepting wagers for the entire period of September 1, 1972, through January 30, 1973. In accordance with the verdict, the District Court entered judgment for the Government for the entire amount of its counterclaim.[2]

### No, Virginia (and Jose), There Is No Loophole

■ As it existed in 1972, § 4401(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 4401(a), imposed a 10% excise tax on wagers. Under §§ 4401(c) and 4403, every person engaged in the business of accepting wagers is liable for the tax on all wagers placed with him and is required to keep a daily record showing the gross amount of such wagers. If, as in this case, a person fails to keep the record required by statute, the Commissioner of Internal Revenue is authorized to estimate the amount of wagers placed with that person by any reasonable method in order to compute his tax liability. See *United States v. Firtel*, 5 Cir., 1971, 446 F.2d 1005. Where the taxpayer pays a portion of the taxes as reconstructed

and assessed by the IRS and then sues for a refund, the taxpayer must establish not only that the Commissioner's assessment of taxes is in error, but also what the correct amount of his tax liability is. See *United States v. Janis*, 1976, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046; *Heyman v. United States*, 5 Cir., 1974, 497 F.2d 121. On the other hand, where the Government attempts to collect a tax by way of counterclaim in a refund suit, the taxpayer bears only the burden of proving the assessment erroneous. See *Carson v. United States*, 5 Cir., 1977, 560 F.2d 693, 696; *Bar L Ranch, Inc. v. Phinney*, 5 Cir., 1970, 426 F.2d 995, 998–99.[3]

Appellants argue that knowledge of the identity of the confidential informant was essential for them to meet this burden of proof. They claim that based on the informant's statement in March 1973 that they were *again* operating a lottery, the informant might have been able to testify that they were not engaged in any lottery operations between September 1972 and February 1973. Therefore, they argue, it was error for the District Court to deny their motion to compel discovery.

■ For this argument they rely primarily on the Supreme Court's decision in *Roviaro v. United States, supra,* the leading case on the scope of the informer's privilege in the federal courts.[4] The Court stated

2. This account of the facts has been drawn from the parties' pre-trial stipulations, the detailed police affidavits filed to obtain the search warrants, depositions taken of various police officers and IRS agents by the appellants, and the briefs filed on appeal. We have not referred to the trial transcript since the appellants did not include it in the record on appeal transmitted to this Court. *Cf.* F.R.A.P. 10(b). However, there is no reason to believe that our statement of the facts is materially inaccurate. The appellants in their briefs have contested none of the evidentiary facts as we have reported them but only their lottery involvement between September 1972 and February 1973 and this ultimate fact was resolved against them by the jury.

3. Nonetheless, the Government must supply *some* foundation for its assessment. See *United States v. Janis, supra,* 428 U.S. at 442, 96 S.Ct. 3021. Notwithstanding the presumption of correctness that attends the Commissioner's

assessments, "a wagering excise tax assessment cannot stand without some evidence tending to support an inference that the taxpayer engaged in gambling activities during the period assessed." *Carson v. United States, supra,* 560 F.2d at 696.

This case, however, does not involve a " 'naked' assessment without any foundation whatsoever," *Janis, supra,* 428 U.S. at 441, 96 S.Ct. at 3026. Even in the truncated record that we have on appeal, *see* note 2, *supra,* there is abundant evidence to sustain the finding that the Suarezes were engaged in the business of operating a lottery between September 1972 and April 22, 1973.

4. As the Court remarked in *Roviaro,* the "informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." 353 U.S. at 59, 77

that "[w]here disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 628. But the Court explicitly declined to establish any "fixed rule" governing disclosure.

> The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62, 77 S.Ct. at 628.

█ Numerous decisions of this Circuit have elaborated upon the balancing called for by *Roviaro*.[5] From these decisions, three categories of cases can be distilled. See *United States v. Fischer*, 5 Cir., 1976, 531 F.2d 783, 787. At one extreme are those cases such as *Roviaro* itself, in which the informant played an active and crucial role in the events underlying a defendant's or litigant's potential criminal or civil liability. In these cases, disclosure and production of the informant is in all likelihood required to ensure a fair trial. See, e. g., *United States v. Silva*, 5 Cir., 1978, 580 F.2d 144; *Gilmore v. United States*, 5 Cir., 1958, 256 F.2d 565. At another extreme are those cases in which the informant was not an active participant, but rather a mere tipster. In those cases, disclosure of the informant's identity is not required by *Roviaro*. See, e. g., *United States v. Alonzo*, 5 Cir., 1978, 571 F.2d 1384; *United States v. Mendoza*, 5 Cir., 1970, 433 F.2d 891, cert. denied, 1971, 401 U.S. 943, 91 S.Ct. 953, 28 L.Ed.2d 225; *Miller v. United States*, 5 Cir., 1959, 273 F.2d 279, cert. denied, 1960, 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747. A third group of cases falls in between these two extremes. In these cases, there is a distinct possibility that the defendant might benefit from disclosure, but the Government claims a compelling need to protect its informant. See, e. g., *United States v. Doe*, 5 Cir., 1976, 525 F.2d 878, cert. denied, 1976, 425 U.S. 976, 96 S.Ct. 2179, 48 L.Ed.2d 801; *United States v. Toombs*, 5 Cir., 1974, 497 F.2d 88. In cases such as these, disclosure is not necessarily required, but we have approved—and in two cases have actually required—an *in camera* proceeding to determine and balance against each other the importance of the informant's testimony to the defendant's case and the strength of the Government's interest in maintaining the

---

S.Ct. at 627. "The purpose of the privilege is furtherance and protection of the public interest in effective law enforcement." *Id.*; see *Scher v. United States*, 1938, 305 U.S. 251, 254, 59 S.Ct. 174, 83 L.Ed. 151.

*Roviaro* was a criminal case, but it is clear that the informer's privilege exists in civil cases as well, see, e. g., *Wirtz v. Continental Fin. & Loan Co. of West End*, 5 Cir., 1964, 326 F.2d 561, and, as in criminal cases, must give way in certain circumstances, see, e. g., *J. H. Rutter Rex Mfg. Co. v. NLRB*, 5 Cir., 1973, 473 F.2d 223, 234, cert. denied, 1973, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55.

5. *E. g., United States v. Silva*, 5 Cir., 1978, 580 F.2d 144 [No. 77–5639, 1978, at 6945]; *United States v. Alonzo*, 5 Cir., 1978, 571 F.2d 1384; *United States v. Hansen*, 5 Cir., 1978, 569 F.2d 406; *United States v. Morris*, 5 Cir., 1978, 568 F.2d 396; *United States v. Alexander*, 5 Cir., 1977, 559 F.2d 1339, cert. denied, 1978, 434 U.S. 1078, 98 S.Ct. 1271, 55 L.Ed.2d 785; *United States v. Scott*, 5 Cir., 1977, 555 F.2d 522, cert. denied, 1977, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478; *United States v. Alfonso*, 5 Cir., 1977, 552 F.2d 605, cert. denied, 1977, 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129; *United States v. Worthington*, 5 Cir., 1977, 544 F.2d 1275, cert. denied, 1977, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72; *United States v. Hernandez-Vela*, 5 Cir., 1976, 533 F.2d 211; *United States v. Fischer*, 5 Cir., 1976, 531 F.2d 783; *Bourbois v. United States*, 5 Cir., 1976, 530 F.2d 3; *United States v. Doe*, 5 Cir., 1976, 525 F.2d 878, cert. denied, 1976, 425 U.S. 976, 96 S.Ct. 2179, 48 L.Ed.2d 801; *United States v. Freund*, 5 Cir., 1976, 525 F.2d 873; *United States v. Toombs*, 5 Cir., 1974, 497 F.2d 88; *United States v. Davis*, 5 Cir., 1973, 487 F.2d 1249; *United States v. Clark*, 5 Cir., 1973, 482 F.2d 103; *United States v. Mendoza*, 5 Cir., 1970, 433 F.2d 891, cert. denied, 1971, 401 U.S. 943, 91 S.Ct. 953, 28 L.Ed.2d 225; *Miller v. United States*, 5 Cir., 1959, 273 F.2d 279, cert. denied, 1960, 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747; *Gilmore v. United States*, 5 Cir., 1958, 256 F.2d 565.

informant's anonymity. See *United States v. Fischer, supra; United States v. Doe, supra; United States v. Freund,* 5 Cir., 1976, 525 F.2d 873.

■ In this case, the confidential informant was nothing more than an informant. Nevertheless, his March 16th statement that appellants were *again* operating a lottery does suggest that, if identified, he might be able to testify that appellants were not operating a lottery for some period prior to March 16, 1973. But the relevance of any such testimony would be most attenuated. The informant appears to have been a marginal observer of the activities of the Suarezes. The most they could expect from him was testimony that to the best of his knowledge they were not engaged in lottery operations for some time prior to March 16th, when, significantly, independent evidence and their own admissions established that they were operating a lottery in February.

Moreover, the informant's testimony was not essential to the appellants' defense in the sense that the informant, as in *Roviaro,* represented the only likely source of exculpatory information. *Cf. United States v. Silva, supra,* Surely there were available to appellants any number of possible witnesses who could testify concerning appellants' activities on Saturdays and Tuesdays—the days on which lottery collections were normally made—between October 28, 1972 (the last date in 1972 that appellants were actually observed in lottery-related activities) and February 1973 (as to which appellants admitted their role in lottery operations). The testimony of such witnesses would certainly have been more relevant than the testimony of a gambler that he did not place any wagers in a Suarez-operated lottery between October and February. Yet the appellants did not attempt to call any such witnesses but instead sought to pin their entire case on the potential testimony of the informant and here seek to have the judgment reversed because the District

Court did not grant them access to that testimony.

In these circumstances, the District Court did not draw the *Roviaro*-balance erroneously. Indeed, the potential value of the informant's testimony to the appellants was of such marginal weight compared to the Government's interest in preserving his anonymity that an *in camera* proceeding was not necessary to perform the balancing task properly.

AFFIRMED.