UNITED STATES of America,
Plaintiff-Appellee,

v.

Pedro Luis MORENO, Felix Gonzalez Valdez, Sebastian Viera, Jose Luis Linares, Lorenzo Aday-Lorenzo and Mario Abascal, Jose A. Fernandez and Jose Aspuru, Defendants-Appellants.

No. 77–5712.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1979.

Rehearings Denied March 2, 1979.

Pedro Luis Moreno, pro se, John M. Barkett, Miami, Fla. (Court-appointed), for Moreno.

Theodore J. Sakowitz, Federal Public Defender, Lurana Snow, Asst. Federal Public Defender, Miami, Fla., for Valdez.

Seymour London, North Miami, Fla., for Fernandez and Linares.

Alvin E. Entin, North Miami Beach, Fla., Ronald A. Dion, North Miami, Fla., for Aspuro, Viera and Aday-Lorenzo.

John H. Lipinski, Miami, Fla., for Abascal.

Jack V. Eskenazi, U. S. Atty., Michael Sullivan, Asst. U. S. Atty., Miami, Fla., for the U. S.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

GODBOLD, Circuit Judge:

This is a marijuana smuggling case. All the appellants were convicted under Count I of conspiracy to possess marijuana with intent to distribute, and under Count II of possession of marijuana with intent to distribute. The convictions are affirmed.

There was ample evidence to permit the jury to find the following facts. Berckmans was an officer of a firm supplying security services for Turkey Point Nuclear Power Plant, a large installation on Biscayne Bay and near Miami, Florida. Berckmans was asked to arrange to plant an outsider in the security force at Turkey Point who would cooperate in the landing of a shipment of contraband described to him as lobster tails and coffee.

The initial approach to Berckmans was made by Navarro and Medina, unindicted co-conspirators. Berckmans began to cooperate with DEA agents. A few days later he was approached by Abascal, who gave him a bribe and discussed the proposed landing operation. Foley, an undercover agent, was planted as the guard. When

word was passed that the shipment was arriving, the Turkey Point area was put under surveillance by numerous agents posted on land and water. They were briefed on the operation beforehand. Foley came to the scene at night, met Abascal, and opened a locked gate to admit a white van with "JG Nursery" signs on it. Soon thereafter, when Foley resumed his rounds as guard, he saw on a road near Turkey Point a blue truck with a white camper body on it sitting beside the road with its lights out and occupied by appellant Valdez. Also, about a mile further along on the same road, he saw another camper, green in color.

Surveilling agents saw two boats enter a canal in the Turkey Point area. The boats passed from view, and no one saw any actual unloading. Later *The Last One*, which was the smaller vessel, came out of the canal, went back in, then reemerged towing the *Andrea*, the larger boat, which had lost power. The boats were stopped and those aboard arrested. Minimal amounts of marijuana were found on the *Andrea*.

Later, on the same night and within a few miles of Turkey Point, the blue truck/camper and the JG Nursery van were stopped and found to contain marijuana.

The defendants fall into several groups: (1) Abascal, the contact man; (2) those aboard the larger boat, the *Andrea* ; (3) those aboard the smaller boat, *The Last One* ; and (4) the two men driving the van and the truck/camper.

### I. Sufficiency of the evidence.

 All defendants argue that the evidence was insufficient.[1] We consider this first with respect to the conspiracy count. This contention by Abascal, the contact man, is almost frivolous. He paid bribes to Berckmans and Foley, promised new cars for all participants, and boasted of the national and international size and scope of his organization. He took Berckmans and Foley to the site to show them where the

contraband was to be landed and told them the site had been used three or four times previously. He explained how the cargo boat would be guided in. On the night of the landing he met Foley at the locked gate and participated in admitting the JG Nursery van. Abascal insists that there was insufficient evidence to support an inference that he had actual knowledge that the cargo was marijuana, emphasizing his numerous references to lobster tails and coffee. The jury was, of course, entitled to infer from the evidence which we have set out, especially the elaborate and costly arrangements for the specific shipment, the mention of previous shipments, and the description of the organization involved, that Abascal knew what the contraband was. Berckmans was not so naive as to take the lobster and coffee talk at face value, the jury was not required to be that naive, nor are we.

The defendants attach significance to the lack of direct evidence that the marijuana in the van and the blue truck/camper came from either or both of the boats. There were other boats in the same area of Biscayne Bay, but there was no testimony that other boats entered the canal. No one actually saw marijuana offloaded from either boat or loaded into vehicles or even observed the boats and the vehicles at the same site. Nevertheless the circumstantial evidence is so strong that lack of observation at canalside makes little difference. As the operation developed it was consistent with Abascal's advance arrangements, and no one saw or even suggests the presence of lobster tails and coffee. Boats, trucks and people assembled at the remote designated place, on the seacoast, at nighttime. The van was summoned, the jury could find, by Abascal's walkie-talkie. It and the two campers took up positions on the only road that led along the canal up which the boats were seen by surveilling agents to disappear. The boats appeared on the bay, flashing lights on and off, briefly entered one canal and then entered and disappeared up a second canal. Engine

---

1. All properly moved for judgments of acquittal.

noises were heard from sources other than the boats, and voices. The jury could infer these came from the vehicles that had been waiting inside the gate. These sounds stopped when the boat engines stopped. Engine noises resumed, and soon *The Last One* emerged, reentered the canal and re-emerged towing the *Andrea.* The blue truck/camper and the van were seen to depart and were soon stopped, loaded with marijuana. Marijuana was found in the larger boat. All of this adequately supports inferences that the source of the marijuana in the blue truck/camper and van was one or both boats.

Viera and Aspuru were on the *Andrea.* A small quantity of marijuana was found on board. Clearly the evidence was sufficient as to them. Though no marijuana was found on *The Last One*, the evidence was sufficient as to those on it, Linares, Fernandez, and Aday-Lorenzo. Its activities, Abascal's statements describing the arrangement for a navigator (or, inferentially, a lead boat) to guide the cargo boat in, the movements of the two boats into and out of one canal and then into the second canal, the temporary departure of *The Last One* and its reentry and return towing the *Andrea*—these adequately support jury submission on the conspiracy count with respect to those aboard *The Last One.*

■ We are required to review the sufficiency of evidence under the possession count with respect to only Abascal because all other defendants received concurrent sentences.[2] There was no evidence that Abascal was ever in actual possession of any of the marijuana. Possibly his role as the person in charge of arrangements for the landing, his presence at the scene, and his activities at the time, were sufficient to support submission to the jury of constructive possession. But we do not need to rest on this basis. In *Pinkerton v. U. S.*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court set out the principle of vicarious liability in conspiracy cases. A conspirator can be found guilty of a substantive offense based upon acts of a co-

conspirator done in furtherance of the conspiracy, unless the act "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647–48, 66 S.Ct. at 1184, 90 L.Ed. at 1497. Several of our judges have noted their concern that vicarious guilt may have due process limitations, *Park v. Huff*, 506 F.2d 849, 864 (CA5, 1975) (en banc) (Thornberry, J., dissenting). This concern need not trouble us here with respect to Abascal. The jury could infer actual possession by the defendants aboard the *Andrea* and the defendants who hauled marijuana away in the van and the blue truck/camper. Attributing the acts of these defendants to Abascal, the planner and expediter of the beachhead end and an active participant at the landing, is not so attenuated as to give us due process concerns.

II. Validity of searches and arrests.

■ There was no error in refusing to suppress the marijuana found on the *Andrea.* There was adequate evidence of probable cause and the circumstances were exigent.

■ Nor was there error in refusing to suppress the marijuana found in the blue truck/camper and the van. After Foley admitted the van through the gate and observed the two campers he radioed to other agents in the vicinity a description of the vehicles. Later he saw the two campers and the van within the Turkey Point area, that is, inside the entry gate through which he had let the van enter. Still later he saw the blue truck/camper and the van leave the Turkey Point area and proceed north on Tallahassee Road with their lights out. He radioed this information.

Defendant Moreno was driving the JG Nursery van when it was stopped. An agent coming south spotted it moving north on Tallahassee Road. The van pulled off the road and turned off its lights. The

---

**2.** Although some of what we have to say relates to the other defendants as well.

agent made a U-turn and found the van had resumed moving north and with its lights still off. He and a back-up unit stopped the van and arrested driver Moreno. The rear door was padlocked and Moreno had no key to it. Moreno concedes that it was lawful to make an investigatory stop of the van but asserts there was not probable cause to arrest him. The van was tied to the Turkey Point activities by the circumstances we have described, and soon after it left Turkey Point and after being observed to operate in an unusual manner, was stopped. While Moreno had not been identified as present at Turkey Point, there was sufficient basis to infer that the person driving the van when the stop was made, whoever he was, was participating in a marijuana conspiracy. The officers only needed probable cause to suspect there was criminal activity afoot and that Moreno was participating in it, not proof certain of it. For purposes of probable cause to arrest, the officers were not required to exclude the possibility that Moreno had no knowledge of the contents of the cargo compartment. A second argument, that officers had insufficient basis to suspect there was marijuana in the van, is disposed of by what we have said concerning sufficiency of the evidence.

■ The officers did not search the van at the scene because the rear door opening into the cargo area was locked. After the van was driven to police headquarters an officer found that a side door was unlocked. He opened the door and found bales of marijuana inside. The entry was proper under *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ A surveilling agent saw the blue truck/camper going north on Tallahassee Road. He followed it while verifying the license number with Foley by radio. Officers in a marked car assisted in making a stop and an arrest. Valdez was asked to open the cargo compartment, he did so, and there were bales of marijuana inside. The officers had probable cause to stop and arrest. What we have just said concerning Moreno applies to Valdez as well. Also

Valdez had been identified by Foley as the driver of the blue truck/camper when Foley first saw it near Turkey Point. Possibly Valdez consented to the search of the van but, in any event, there was probable cause to search and exigent circumstances.

### III. Disclosure of informer.

■ During the testimony of Berckmans defense counsel moved for the disclosure of a confidential informant who had met with persons involved in the conspiracy before Abascal contacted Berckmans and began the series of events described above. After oral argument the court denied the motion. This was not error. There was no contention that the informer participated to any extent in the events we have described. Rather, in the initial stages of the venture, he dealt with the unindicted conspirators, Navarro and Medina, before they first approached Berckmans. This court has held that where the informant was not an active participant in the criminal activity, but only a tipster, disclosure of his identity is not required by *Roviaro v. U. S.*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). *Suarez v. U. S.*, 582 F.2d 1007, 1011 (CA5, 1978); *U. S. v. Alonzo*, 571 F.2d 1384, 1387 (CA5, 1978). There is no contention that any of the defendants, or Berckmans or Foley, ever met or talked with this informer. Defendants asserted a right to know his identity on the basis that his early conversations with Navarro and Medina might shed light on their theory that they had no knowledge marijuana was involved in the shipment. This possibility of obtaining relevant testimony is too remote to require disclosure. *See Suarez v. U. S., supra* at 1012; *U. S. v. Morris*, 568 F.2d 396, 400 (CA5, 1978). Something more than speculation about the possible usefulness of an informant's testimony is required. *U. S. v. Hansen*, 569 F.2d 406, 411 (CA5, 1978).

### IV. Admission of evidence.

The admission into evidence of a tackle box found aboard *The Last One* was within the discretion of the trial court.

## V. The limiting instruction concerning hearsay.

 Early in the direct examination of Berckmans he was asked about conversations between him and Abascal. Defendants asked for an instruction limiting to Abascal the effect of statements made by him. The court gave this instruction:

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statement thereafter knowingly made and the act or acts knowingly done by any person likewise found to be a member may be considered by the jury as evidence in this case as to the other defendants found to have been a member, even though the statement and act may have occurred in the absence and without the knowledge of the defendant, provided that such statement and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admission or incriminatory statement made or act done outside of the court by one person may not be considered as evidence against any person who was not present and did not hear the statement made nor see the act done.

Therefore, the statements of any conspirator which are not in furtherance of the conspiracy or made before its existence or after its termination, may be considered as evidence only against the person making that statement.

I repeat that the Government will have to show to the Court and to the jury that there has been by independent evidence, not of a hearsay nature, evidence sufficient to establish the particular defendant's connection with the conspiracy, <u>and that determination will be made by the Court.</u>

Now, I also remind you that this testimony if used, only applies to Count I of the indictment and does not apply to the substantive count which is the count that charges possession with the intent to distribute and does not charge a conspiracy.

Defendants objected to the underlined language on the ground that it would lead the jury to believe that a ruling by the court that the evidence was sufficient to tie a defendant into the conspiracy would be a direction to them that as a matter of law the particular defendant was a member of the conspiracy. The phrase was ambiguous. But at least three times later during the testimony the court gave the limiting instruction free of the phrase objected to, and without objection, and gave a similar instruction in the charge to the jury. Also, Abascal's statements implicated by name no other persons charged as conspirators but only by descriptive terms such as "truck drivers" and "navigator." In these circumstances the ambiguous phrase, used once in this lengthy trial, was not reversible error.

The convictions are AFFIRMED.