ESTATE OF VICTOR A. SIMEONE, JR., DECEASED, MARIA SIMEONE, ADMINISTRATRIX, AND MARIA SIMEONE, AND WILLIAM GORDON BENNETT a/k/a WILLIAM BENNETT, JR., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Simeone v. Commissioner
Docket No. 16253-80.
United States Tax Court
T.C. Memo 1983-317; 1983 Tax Ct. Memo LEXIS 472; 46 T.C.M. (CCH) 330; T.C.M. (RIA) 83317; June 6, 1983. *472 On December 8, 1979, Victor Simeone and William Bennett were arrested at South Bimini in the Bahama Islands and charged with criminal possession of 435-3/4 pounds of cocaine. During the first part of 1980, these two individuals made a concerted effort to reacquire the seized cocaine from an undercover narcotics agent whom they believed to be a corrupt Bahamian official. They were arrested, along with Mr. Simeone's wife, on May 28, 1980, while attempting to purchase a sample of the cocaine with $361,029 cash. Respondent determined that the Simeones and Mr. Bennett had unreported income for the 1979 taxable year. Held, respondent's determination with respect to Mr. Simeone is upheld. Held further, respondent is correct in the assertion that Mr. Bennett had unreported income, but the amount of his determination is excessive and is adjusted accordingly. Held further, Mrs. Simeone is not relieved of liability as an "innocent spouse" pursuant to sec. 6013, I.R.C. 1954. Held further, petitioners are liable for the addition to tax pursuant to sec. 6653(a). Sidney A. Soltz, for the petitioners. David R. Smith, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, *473 Judge: By notice of deficiency dated August 4, 1980, respondent determined deficiencies in and additions to petitioners' Federal income taxes for the taxable year 1979 as follows: Addition to tax
Petitioner
Deficiency
pursuant to sec. 6653(a)
Estate of Victor A. Simeone,
$1,252,510
$62,626
Jr., Deceased, Marie A.
Simeone, Administratrix, and
Maria Simeone, and
William Gordon Bennett a/k/a
1,257,022
62,851
William Bennett, Jr.
The issues for decision are (1) whether petitioners had unreported income during 1979 in the amount determined by respondent; (2) whether petitioner Maria Simeone is relieved of liability pursuant to the "innocent spouse" provision of section 6013(e), I.R.C. 1954; and (3) whether petitioners are liable for the addition to tax pursuant to section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Victor A. Simeone, Jr. and his wife, Maria Simeone, resided in Sunrise, Florida at the time of filing the petition herein. They filed a joint Federal income tax return for the taxable year 1979 with the Internal *474 Revenue Service Center, Philadelphia, Pennsylvania. Petitioner William Gordon Bennett resided in West Palm Beach at the time of filing the petition herein. He filed an individual Federal income tax return for the taxable year 1979 with the Office of the Director, Internal Revenue Service Center, at an unspecified location. Mr. Simeone and Mr. Bennett met in late 1978 and became good friends over the next two years. On December 8, 1979, Mr. Simeone, Mr. Bennett and four other individuals were arrested at South Bimini in the Bahama Islands and charged with criminal possession of 435-3/4 pounds, or 197.64 kilograms, of cocaine which was contained in ten canvas bags. They were also charged with criminal possession of various firearms and ammunition. Cash bonds in the amount of $100,000 each were posted for Mr. Simeone and Mr. Bennett, and both men were released on bond shortly after their arrest by Bahamian police. [1] The 435-3/4 pounds of cocaine was confiscated by the Bahamian government. In May 1980, Glenn Brown, a special agent with the Drug Enforcement Administration (hereinafter *475 DEA) since 1966, was assigned to an undercover investigation of Mr. Simeone, who he learned was interested in purchasing the cocaine that had been seized in December of 1979. Agent Brown led Mr. Simeone to believe that he was a corrupt Bahamian official who could arrange for the purchase of the cocaine. Agent Brown met with Mr. Simeone on two occasions, the first of which was on May 8, 1980 when they, along with several other individuals, had lunch at a restaurant in Fort Lauderdale. After lunch, Mr. Simeone, Agent Brown and Debra Lemz met in a car driven by Ms. Lemz. During the meeting, Mr. Simeone told Agent Brown that he wished to buy back the cocaine which had been seized from him in the Bahamas in December of 1979. Agent Brown told Mr. Simeone that some of the cocaine had already been sold, but that he could arrange for Mr. Simeone to purchase the remainder at $15,000 per kilogram if delivery was taken in the Bahamas or $17,000 per kilogram if delivery was taken in Florida. Mr. Simeone told Agent Brown that he initially would purchase a small quantity of cocaine, and if he was satisfied with its quality, he would purchase the remaining lot. On the morning of May 9, 1980, *476 Mr. Simeone called Agent Brown and arranged a second meeting for later that morning at the same restaurant. Accordingly, at 11:00 a.m., Mr. Simeone met with Agent Brown, who was accompanied by another DEA agent named Avelino J. Fernandez. The meeting, which took place inside an automobile driven by Mr. Simeone, lasted 10 to 15 minutes. Agent Fernandez was not a participant in the meeting. During the meeting, Mr. Simeone indicated that he was willing to close the deal immediately. Agent Brown replied that he needed "three or four days or maybe a week" to make arrangements in Nassau. Beginning sometime during April 1980, Agent Fernandez began participation in the undercover investigation of Mr. Simeone, posing as a Cuban named "Andre" who was a friend of Agent Brown. On May 20, 1980 Agent Fernandez met with Mr. Simeone, who told him that he wanted the cocaine delivered to Florida and that he had approximately $2 million to make the purchase. Agent Fernandez told Mr. Simeone that he had to see some money to be sure that Mr. Simeone was willing and able to purchase the cocaine. Agent Fernandez and Mr. Simeone met again on May 28, 1980. At this meeting, Mr. Simeone stated that *477 he was ready to go through with the transaction, and that he would take Agent Fernandez to see the money. Thereafter, Mr. Simeone took Agent Fernandez to his home. When they arrived, Mrs. Simeone and Mr. Bennett were already present. While in the house, Agent Fernandez noticed a.45 caliber pistol in plain view. When he asked Mr. Simeone about this, Mr. Simeone replied that he had the gun to protect his money. At some point during the conversation, Mr. Simeone instructed his wife to go get the money. She then left and returned shortly thereafter with a bag containing a large amount of cash. Mr. Simeone stated that there was enough money to purchase a sample of 20 kilograms of cocaine and that Mr. Bennett would pick up such cocaine in his Ford Bronco. Agent Fernandez then left the Simeones' house. Shortly thereafter, he, another DEA agent, and local police surrounded the house and arrested Mr. and Mrs. Simeone and Mr. Bennett. [2] *478 During the raid, the officers seized six loaded handguns, one loaded shotgun, the bag of money, and three motor vehicles. The agents determined that the bag contained $361,029 in cash. On or about July 22, 1980, Mr. Simeone, Mr. Bennett, Debra Lemz, George R. Kidwell, George Tsiotis, and Ernesto Del-Campo went on trial in Magistrate's Court, New Providence, Commonwealth of the Bahamas, on the narcotics and firearms charges stemming from their December 8, 1979 arrests. At this trial, five Bahamian police officers who were present at the scene of the arrest on December 8, 1979 testified concerning the events of that night. At the conclusion of the Government's case-in-chief, on July 25, 1980, the Magistrate entered an order acquitting all six defendants of all charges due to serious discrepancies in the testimony of the five police officers. Mr. and Mrs. Simeone, Mr. Bennett, and Debra Lemz all were indicted by a Federal grand jury on June 16, 1980 on charges stemming from the May 28, 1980 arrests. The criminal case came to trial in the U.S. District Court for the Southern District of Florida in September of 1980, but it resulted in a mistrial. Mr. Simeone was shot to death at his home in Sunrise, Florida on December 15, 1980. After his death, the government dismissed *479 the indictment with respect to the other three defendants. On their Federal income tax returns for the years 1971 through 1979, the Simeones reported adjusted gross income (AGI) or taxable income as follows: Taxable Year
Taxable Income
1971
$4,757.28 (AGI)
1972
45,195.00
1973
43,121.00
1974
13,165.00
1975
10,744.00
1976
13,700.00
1977
25,000.00 (AGI)
1978
26,343.00 (AGI)
1979
39,893.00 (AGI)
From 1974 through 1979 Mr. Simeone purchased a number of airplanes. On November 3, 1976 he purchased a 1955 Rolls Royce sedan. On February 27, 1976 he and his wife purchased their residence for $33,000 in cash. On July 12, 1978 a Lincoln Continental was purchased in Mrs. Simeone's name for $13,810 in cash. On January 2, 1980 a Pontiac Grand Prix was purchased in Mrs. Simeone's name for $7,141 in cash. Finally, the local police found approximately $100,000 cash in the Simeone's house at the time Mr. Simeone's body was found. Mr. and Mrs. Simeone reported no income from narcotics trafficking on their 1979 Federal income tax return, nor did they maintain any books and records relating to such activity. Mr. Bennett reported total income of $33,922 on his 1979 Federal income tax return, $28,684 of which was reported *480 as gambling winnings. Mr. Bennett reported no income during 1979 from narcotics trafficking, nor did he maintain any books and records relating to such activity. Respondent determined that petitioners had a large amount of unreported income from drug trafficking during 1979. He computed the unreported income by using the expenditures method. Accordingly, it was determined that Mr. and Mrs. Simeone purchased one-half of the 197.65 kilograms of cocaine, or 98.825 kilograms, in December of 1979. It was determined that Mr. Bennett purchased the other half. Respondent calculated the fair market value of cocaine to be $25,000 per kilogram. Accordingly, he determined that the Simeones and Mr. Bennett each had $2,470,625 in unreported income for 1979. OPINION Respondent reconstructed the income of the Simeones and Mr. Bennett by means of the expenditures method of proof. Based upon his conclusion that petitioners owned the 435-3/4 pounds of cocaine that was seized in the Bahamas, respondent determined that there was a total of $4,941,250 in unreported income. This amount he divided equally between the Simeones and Mr. Bennett. Mr. Bennett was the only petitioner to testify. He stated *481 that neither he nor the Simeones were involved in the Bahamian cocaine transaction and that their attempt to repurchase the confiscated cocaine from the undercover agents was intended only to expose the allegedly corrupt Bahamian police. We believe that Mr. Bennett's and Mr. Simeone's simultaneous presence in South Bimini at the time of the drug seizure was more than coincidence. Furthermore, we cannot give credence to Mr. Bennett's testimony that Mr. Simeone attempted to repurchase the cocaine solely to set up the "crooked" Bahamian officials. It is our conclusion that Mr. Simeone and Mr. Bennett were involved in the original cocaine purchase in 1979 and that they attempted to repurchase their lost cocaine in 1980 at what they believed to be a bargain price. We are utterly convinced that Victor Simeone was deeply involved in the drug trade during 1979. From 1974 through 1979, he purchased a number of airplanes, a number of automobiles, and a personal residence, primarily with cash. Additionally, he came up with the cash to satisfy his $100,000 bond and most of Mr. Bennett's $100,000 bond set in December 1979 after their arrest in the Bahamas.Mr. Simeone also had at least $361,029 *482 in cash [3] on May 28, 1980 and stated that he had approximately $2 million to purchase the confiscated cocaine. Another $100,000 in cash was found in Mr. Simeone's home at the time of his death. The presence of six loaded handguns and one loaded shotgun in Mr. Simeone's home and automobiles is quite consistent with our conclusion that Mr. Simeone was a drug dealer. The assertion that Mr. Simeone was attempting to "set up" Bahamian officials is beyond belief. He did not notify U.S. officials of his plans [4] *483 and produced over $360,000 in cash to make the purchase. There was no guarantee that the officials that he allegedly was setting up were the same officials who supposedly framed him in December. All his acts and statements during the negotiation of the drug deal indicate a familiarity with the drug trade and a serious intention to acquire the cocaine at a bargain price. While it does not appear that Mr. Bennett was a major figure in the drug operation, the evidence establishes quite clearly that he was well aware of what was going on. In fact he claimed credit for the idea of the "scam" operation with the Bahamian officials. Respondent utilized the expenditures method of proof in determining petitioners' unreported income. This is a permissible and an appropriate method for reconstructing petitioners' income. Taglianetti v. United States,398 F.2d 558, 562 (1st Cir. 1968), affd. per curiam 394 U.S. 316 (1969). Mathematic exactitude is not required for such requirement "would be tantamount to holding that skillful concealment is an invincible barrier to proof." United States v. Johnson,319 U.S. 503, 518 (1943). Petitioners stipulated at trial that they would not contest that the statutory notice of deficiency was arbitrary and capricious, see Suarez v. United States,582 F.2d 1007, 1010 n. 3 (5th Cir. 1978), and therefore the usual presumption *484 of correctness which attaches to respondent's determinations stands. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.[5]
In order to sustain their burden of proof, petitioners must show that the expenditures were made from nontaxable sources or by someone else. Burgo v. Commissioner,69 T.C. 729, 743 (1978). Petitioners did not allege that the cocaine was purchased with funds obtained from nontaxable sources since they relied entirely upon the claim that Mr. Simeone and Mr. Bennett did not acquire the cocaine in the Bahamas. Since we have chosen not to believe this assertion, petitioners' only other recourse is to prove that respondent's estimate of amount expended by petitioners for the cocaine is overstated. [6] *485 *486 Respondent called two witnesses who testified that the wholesale value of the cocaine seized was in the range of $15,000 to $26,000 per kilogram, depending upon its purity. Petitioners did not put on any evidence to refute this testimony or otherwise carry their burden of proving that a lower figure was more accurate. Accordingly, we sustain respondent's determination that the seized cocaine was purchased at a price of $25,000 per kilogram. Respondent determined that Mr. Simeone acquired one-half of the total cocaine confiscated in the Bahamas and based his deficiency on this amount. It is clear from the evidence that Mr. Simeone played a major role in the acquisition and attempted reacquisition of the cocaine and that he had large cash resources at his disposal even after the seizure of the cocaine. Accordingly, *487 because of these considerations and because petitioners failed to introduce evidence controverting respondent's allocation, we uphold respondent's deficiency determination with respect to Mr. Simeone. We are not in agreement with respondent with respect to Mr. Bennett's role in the drug transaction. There was no evidence that Mr. Bennett made a large number of cash purchases prior to the Bahamian fiasco. He was able to pay only $3,500 toward his bail after being arrested. Moreover, none of the cash offered for the repurchase of the cocaine in May of 1980 belonged to Mr. Bennett. At most, we think Mr. Bennett was a bit player, more of a "gofer," in the Bahamian cocaine acquisition and that his share of the total quantity purchased was only one-tenth. This fraction is based on our finding that Mr. Simeone owned one-half of the cocaine and a finding that each of the other five individuals arrested along with him had equal shares of the remaining lot. [7] It is our belief that Mr. Bennett did not have the resources to purchase $2,470,625 worth of cocaine. On the other hand, having observed Mr. Bennett on the witness stand, the Court cannot find that he overcame his burden to prove *488 that he had received no income in 1979 with which to purchase a portion of the cocaine. Accordingly, we hold that Mr. Bennett underreported income for 1979 in the amount of $494,125. [8]
Petitioner Maria Simeone made no argument that she should be relieved of liability pursuant to section 6013(e). Likewise, petitioners made no argument disputing the additions to tax pursuant to section 6653(a). Accordingly, *489 because petitioners bear the burden of proof with respect to such issues, Welch v. Helvering,supra, we hold for respondent. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Mr. Bennett paid only $3,500 of his cash bond. The remainder apparently was posted by Mr. Simeone.↩
2. Mrs. Simeone was arrested as she attempted to back her car out of the driveway. The bag of money was found in her car and a loaded handgun was found in her purse.
3. This amount alone exceeds the total amount of taxable income reported by the Simeones for the taxable years 1971 through 1979 combined. ↩
4. We think that Mr. Simeone's failure to contact U.S. officials is extremely incriminating. The logic underlying Messrs. Simeone's and Bennett's alleged plan to acquire cocaine, which without some sort of prior approval by or cooperation with law enforcement authorities constitutes a criminal act, in order to prove their innocence of a similar criminal charge somehow escapes us.
5. Although petitioners appear to raise this issue in their brief, we hold that they are bound by their stipulation in open Court, especially in light of respondent's withdrawal of the offer of certain evidence based on this stipulation.↩
6. Petitioners called an expert witness who testified that, given what little he knew about the transaction in the Bahamas, it sounded as if the drugs were being "off-loaded" at the time they were seized. He stated that, customarily, payment is not made until after the "off-loading" stage. Thus, it is argued that, even if Mr. Simeone and Mr. Bennett intended to purchase the cocaine, such acquisition had not been completed at the time of its seizure and, therefore, the expenditures method is inappropriate. We disagree. First, petitioners' witness frankly stated that he knew "very little" about the facts of the Bahamian cocaine seizure and therefore his testimony is reduced in weight. Second, even if we assume that the actual purchase had not been made, respondent's determination is not thereby upset. The expenditures method is merely a means of measuring unreported income. In this respect, given petitioners' witness's testimony that drug acquisitions normally are made with "cash on the barrel," we believe that the fact that Mr. Simeone and Mr. Bennett were in the final stages of completing the cocaine purchase is sufficient to support respondent's determination that they had the cash to make the purchase. With respect to Mr. Simeone, his subsequent statement that he had $2 million to purchase the confiscated drugs gives further support to this alternative conclusion.
7. Respondent did not explain, for instance, why none of the cocaine was attributed to Debra Lemz, who was arrested in the Bahamas, participated in the attempt to repurchase the cocaine, and was indicted along with the Simeones and Mr. Bennett on charges stemming from the May 28, 1980 arrests. ↩
8. Petitioners have not argued in the alternative that they are entitled to offsetting deductions for the confiscated cocaine pursuant to secs. 165(a) and 165(c)(1), possibly because the law is clear that they are not entitled to such deductions because to allow them would be contrary to public policy. Fuller v. Commissioner,213 F.2d 102, 106 (10th Cir. 1954); Holmes Enterprises v. Commissioner,69 T.C. 114, 117 (1977); Holt v. Commissioner,69 T.C. 75, 81 (1977), affd. 611 F.2d 1160↩ (5th Cir. 1980).