**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jimmie TOOMBS, Defendant-Appellant.
No. 73–1830.**

United States Court of Appeals,
Fifth Circuit.

July 17, 1974.

Robert A. Harper, Jr., Gainesville, Fla., for defendant-appellant.

William H. Stafford, Jr., U. S. Atty., Robert L. Crongeyer, Jr., Asst. U. S. Atty., Pensacola, Fla., Melvin R. Horne, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before MOORE*, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellant Jimmie Toombs and codefendant Lewis Knight ("Slim") were indicted for conspiring to distribute and distributing 1.05 grams of heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Knight entered a plea of guilty and subsequently testified on behalf of the Government. A jury found

* Hon. Leonard P. Moore, Senior Circuit Judge of the Second Circuit, sitting by designation.

Toombs guilty as charged and he was sentenced on each count to ten years' imprisonment, the sentences to run consecutively.

On February 20, 1973, prior to the empanelling of a jury, defense counsel filed a motion to compel disclosure of an alleged informant (known as "James"). In a bench conference the court denied the motion, saying:

"The Court has considered the motion and finds that it has not been timely filed and is not otherwise sufficient to require the Court to grant the motion."

Counsel for defendant then indicated, in response to the court's question, that pending the disposition of a previously filed motion for a continuance, the defense was ready for trial. No argument was had or requested on the motion for disclosure. The motion for continuance was denied, the jury empanelled, and the trial was recessed until February 23.[1]

On appeal, appellant alleges (1) that the record fails to establish a conspiracy and (2) that the trial court erred in denying a motion to compel disclosure of the informer. We find no merit to these contentions and affirm.

Special Agent Ellis Dean of the Bureau of Narcotics and Dangerous Drugs and codefendant Knight testified to the events leading up to the sale of heroin. Appellant Toombs took the stand and testified to his innocence. Also called as defense witnesses were two individuals who were allegedly with Toombs at the time that the heroin changed hands. The substance of the defense testimony was that codefendant Knight was the perpetrator of the crime.

Special Agent Dean testified that on November 4, 1972, he and a confidential informant visited Knight at his residence in Gainesville, Florida, and purchased cocaine from him. Agent Dean then asked Knight if he knew where they could buy some heroin. Knight re- sponded that he would take Dean and the informant to "Jimmie" [Toombs] for that purpose. Agent Dean, Knight and the informant then proceeded in a Government vehicle to a shoe-shine shop in Gainesville. Upon their arrival Knight exited the vehicle and walked to the rear of the shoe-shine shop. Approximately two minutes later Knight and another individual (later identified as appellant Toombs) walked over to a Cadillac parked approximately 10 yards from the Government vehicle. Toombs entered the right side of the Cadillac, which was subsequently established to belong to him. From where he was seated in the Government vehicle, Agent Dean saw a light go on in the glove compartment of the Cadillac "and then it appeared to [him] that someone was taking something out of the car." Toombs then returned to the rear of the shop and Knight walked over to the Government vehicle where he told Agent Dean that Toombs "had a $50.00 piece" and if Dean wanted it he should give Knight the money for it. Dean complied and gave Knight $50 in bills, the serial numbers of which had been previously recorded. Dean complied whereupon Knight returned to the rear of the shop. Dean and the informant then exited the Government vehicle and proceeded in the same direction where they were met by Knight returning with a tinfoil packet which he handed to Agent Dean. The packet contained a white powdered substance. Dean and the informant, after discussing the light weight of the packet, entered the shop. Knight introduced Dean to Toombs. Dean asked Toombs if "this was the usual weight of a $50 piece from him because we asked him if whether or not Slim [Knight] had been in the package," to which Toombs replied, "This is my usual weight on a $50 piece." They talked about seeing Toombs later and possibly purchasing more heroin. After this discussion Dean drove Knight to his residence and

---

1. In chambers, on February 23, prior to the actual proceedings, Government counsel informed the court that the informant had been shot three times since the time of the incident in question.

Dean and the informant returned to Government headquarters where a test was made of the contents of the packet. The substance was determined to be heroin.

Except for minor variations,[2] codefendant Knight's testimony substantially corroborated that of Dean. He further described the incidents leading up to the sale.[3]

Knight admitted that he was formerly a heroin addict and that James had been his principal supplier.

Defendant Toombs testified that he had never seen Agent Dean prior to the time that Dean entered his house to arrest him. He gave the following account of his activities on the night of November 4, 1972. He was playing a pinball machine at Woody's shoe-shine parlor and engaging in a discussion about a football game when Knight entered the shop for a brief time. About five minutes later Knight returned with the informant, known to him as "James." Knight approached Toombs with a piece of tinfoil paper, handed it to him and asked if it was "a 50-cents piece."

Toombs took it and said it looked to him like a 50-cent piece and James said, "I just want to know because I got my money tied up in it." Knight and James then walked back out the door. Toombs said that that was the extent of his conversation and activities with Knight that day. He said that although Knight and James had been to his house about four times trying to get drugs from him he had not then, nor ever had, sold drugs to either Knight or James. On cross-examination, Toombs admitted that the Cadillac parked in the vicinity of the shoe-shine shop on the night of November 4 was owned by him. He denied, however, having gone to the vehicle with Knight or telling Knight that he had 50-cent pieces of heroin worth $50. He said that the tinfoil packet exhibited to him at trial looked like the package Knight gave him to examine. Toombs denied that Knight was addicted to heroin and that he, Toombs, had ever supplied the drug to Knight.

Defendant's two companions at the shoe-shine shop on the night in question corroborated his testimony in regard to

2. According to Knight, it was the informant who introduced Agent Dean to Toombs. Further, Knight said he delivered the tinfoil packet to the informant. When asked from whom he had received the $50, Knight said, "I *believe* I received the $50.00 from James [the informant]."

3. Q. Mr. Knight, do you recall the evening of November 4th when Mr. Dean came to your house?
A. Yes, sir.
Q. At that time did you distribute some cocaine to him?
A. Yes, sir.
Q. After that did he make any inquiries as to whether you knew where he could get some heroin?
A. Yes, sir, he did.
Q. What happened after that?
A. I told him yes, and we got in his car and we went up on to a place called the Smoke Shop on 5th Street, then he parked and I got out of the car and I went over and seen Jimmie, so I asked him, I wanted to purchase $50.00, what we call a $50.00 piece of heroin, so we got in the car and sat down in the car, sat down.

Q. Which car is this? Is this Jimmie's car?
A. Yes.
Q. What kind of car is it?
A. A 1968 blue Cadillac, I believe.
Q. All right.
A. And so he had it ready for me and so when I got out of the car to come back to the car where a fellow by the name of Dean and James was sitting, I told them to give me the money and so they give me the money and I went back to the Smoke Shop, on the side of the Smoke Shop, where I give Jimmie the money for the purchase of heroin. By the time I turned, fixing to go back, I met Dean and Jimmie halfway meeting me, so I give the package to James. He looked in the package, he looked at it, opened it right there and said it didn't look right for $50.00, so by that time he went on and made hisself recognized to Jimmie. I guess he thought I had done went in the package, so he asked Jimmie, is this what he gave me for $50.00, and Jimmie received the package and said yes, I hadn't been in it, that is what he give me. At that time James introduced himself and then he introduced Dean to Jimmie.

the conversation about a 50-cent piece. They also said that the only person who entered the shop with Knight was a short black man, not Agent Dean.

Defendant's wife corroborated his testimony that Knight had been to their home on several occasions to ask her husband about drugs, that the men had argued on those occasions and that her husband had told Knight that he was never to return to the house.

Appellant contends that the Government's testimony shows that the informant was a material witness and an active participant in the alleged transaction and that therefore disclosure of his identity and whereabouts was relevant, helpful to the defense and essential to a fair determination of the cause. Because of the disparities between the testimony of the Government's two principal witnesses, Agent Dean and Knight, as well as the conflict between the testimony of the prosecution and defense witnesses, appellant contends the credibility of the Government's witnesses is weakened.

■ Public policy forbids disclosure of the identity of an informer except where it is essential to the defense. Scher v. United States, 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938). The purpose of the informer's privilege is "the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).[4] The privilege, however, has its limitations and disclosure is required where it may be "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." Roviaro, supra, 353 U.S. at 60, 61, 77 S.Ct. at 628. The Supreme Court in Roviaro set certain standards for weighing the need for disclosure against the privilege of withholding such information. "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 62, 77 S.Ct. at 628, 629. See also Rugendorf v. United States, 376 U.

4. In Roviaro, the Government relied on the testimony of two federal narcotics agents, Durham and Fields, and two police officers, Bryson and Sims, each of whom knew petitioner by sight. On the night in question these four men met "Doe," an informer, searched him and his Cadillac and found no narcotics. Bryson secreted himself in the trunk of Doe's Cadillac and Doe drove to a certain location, followed by Durham in one car and Fields and Sims in another. Roviaro subsequently arrived at the location and entered Doe's Cadillac. They then proceeded to another location by a circuitous route. Durham managed to follow the Cadillac and when it stopped Durham likewise stopped his vehicle approximately 100 feet away. Durham saw Roviaro walk a few feet to a nearby tree, pick up a small package, return to the Cadillac, make a motion as if depositing the package in the car, wave to Doe and then walk away. Durham immediately went over and recovered a package from the floor of the Cadillac. Petitioner reentered his vehicle and drove away. Bryson in the meantime had heard, from his concealed position in the trunk, petitioner greet Doe and direct him where to drive, telling him at one time to pull over and turn out the lights in order to lose a "tail," and also that he had brought him "three pieces this time." After the car stopped, Bryson raised the lid of the trunk, saw Roviaro walk to a tree, pick up a package and return toward the car. He heard Roviaro say, "Here it is," and "I'll call you in a couple of days." At Durham's signal shortly thereafter, Bryson emerged from the trunk and found Durham holding a package, which was later proved to contain an opium derivative. Roviaro v. United States, 353 U.S. at 56, 57, 77 S.Ct. at 625, 626.

S. 528 at 534, 535, 84 S.Ct. 825 at 829, 11 L.Ed.2d 887 (1964).

■ Applying this test to the facts, it is apparent that nondisclosure of the informer did not inhibit appellant's preparation of his defense. In his motion for disclosure and accompanying affidavit, appellant's allegations that the informant was an active participant and a material witness to the alleged transaction were merely conjectural.[5] He made no showing of how disclosure of the informant's identity would be helpful to his defense. *See* Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). Entrapment was neither asserted nor argued. To the contrary, appellant's defense was simply that Knight, and not he, was the owner of the packet of heroin referred to in the indictment. The informant was not charged with dealing with defendant. Nowhere in the indictment against defendant is there any reference to any joint activities or confederation between the accused and anyone who could possibly be construed as the informant. *Cf.* Portomene v. United States, 5 Cir., 1955, 221 F.2d 582; Sorrentino v. United States, 9 Cir., 1947, 163 F.2d 627. Nor was the informant an active participant in setting the stage in creating the atmosphere of confidence beforehand and continuing it by his close presence during the moments of critical conversation. *Cf.* Gilmore v. United States, 5 Cir., 1958, 256 F.2d 565, 567. Appellant's allegation, in his affidavit to support the motion for disclosure, that the informant was "the only known witness who observed and/or overheard the alleged transaction," is contradicted by the actual evidence presented by both the prosecution and

defense. Unlike the informant in *Roviaro*, referred to by the Supreme Court as "the sole participant, other than the accused, in the transaction charged," 353 U.S. at 63, 64, 77 S.Ct. at 630, the informant here had no participation in the transfer of the heroin packet, much less sole participation. According to the Government's evidence, this entire transaction was handled between Knight and defendant Toombs. Both Agent Dean and Knight testified that the money was given to Knight who exchanged it for the packet from Toombs. It was only after this transaction was completed did Agent Dean, accompanied by the informant, confront Toombs to question him relative to the weight of the package. The obvious purpose of this face-to-face meeting, to verify the fact that Toombs was the seller, was accomplished when Toombs told Dean that it was his "usual weight on a $50 piece." Thus, immediately following the sale, the Government agent had advantages, unavailable to the agent in *Roviaro*, of a direct confrontation with the accused for the purpose of establishing both identity and evidence that he was in fact the heroin distributor. The informant's participation was minimal. His primary role as an informant was to lead Dean to Knight, the cocaine distributor. But it was Knight who supplied the name and whereabouts of Toombs. It was Knight and not the informant who received the packet from Toombs. Knight was present at the trial and cross-examined extensively by the defense. Under the circumstances, there was little, if anything, to be gained from testimony of the informant. Conceding, *arguendo*, the unlikely possibility that the informant would have corroborated defendant's account of the events, his testimony would have been

---

5. Much more than speculation is required. There must be a compelling reason for the disclosure. "If the informer's relation to the acts leading directly to or constituting the crime may be assumed from a fertile imagination of counsel, the government in practically every case would have to prove affirmatively that the informant had not done any such likely acts. Having done that, all would be revealed and the informer privilege, deemed essential for the public interest, for all practical purposes would be no more." Miller v. United States, 5 Cir., 1959, 273 F.2d 279, 281. *See also* Bruner v. United States, 5 Cir., 1961, 293 F.2d 621; Lira-Ortega v. United States, 5 Cir., 1968, 401 F.2d 506; United States v. Ruacho-Acuna, 5 Cir., 1971, 440 F.2d 1199.

cumulative to that of the two defense eyewitnesses, whom the jury chose to disbelieve.

Turning now to the other side of the *Roviaro* balancing test, we find serious relevant factors here which require non-disclosure. The necessity of anonymity of the informant for his personal safety is greater than the theoretical necessity possibly underlying refusals to disclose. This informant, according to the prosecutor's in-chambers declaration, had been shot three times subsequent to the incident in question.[6] His usefulness to law enforcement officials has already been demonstrated by his role in supplying information relative to Knight, another narcotics law offender. Disclosure of his identity would not only destroy any future usefulness but possibly jeopardize his life. We find no error in the district court's refusal to permit disclosure.[7] The positive advantages to the Government in withholding the informant's identity far outweigh any speculative benefits to the accused.

■■ Appellant contends that the alleged conspiracy and substantive offense arose out of the same set of facts and transactions, was simply a sale to a willing purchaser, and constituted one offense only. We do not agree. The crime of conspiracy is completed upon an agreement among the conspirators to commit an unlawful offense attended by an overt act by one or more of the conspirators in furtherance of the conspiracy. Pettibone v. United States, 148 U. S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893); United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); United States v. McGann, 5 Cir., 1970, 431 F.2d 1104; United States v. Lowry, 5 Cir., 1972, 456 F.2d 341. The agreement, however, need not be a formal one. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct.

1125, 90 L.Ed. 1575 (1946); Norfolk Monument Co. v. Woodlawn Mem. Gardens, 394 U.S. 700, 89 S.Ct. 1391, 22 L. Ed.2d 658 (1969). The conspiracy count here charged that Knight and Toombs conspired to distribute a controlled substance and that in furtherance of this conspiracy the defendants committed several overt acts. One of the overt acts alleged is that the coconspirators sold and distributed approximately 1.05 grams of heroin, the same offense alleged in the substantive count.

■ It has long been recognized that the commission of the substantive offense and the conspiracy to commit it are separate and distinct offenses and that separate sentences for the same overt act charged in both the conspiracy and substantive counts do not constitute double punishment. Pinkerton v. United States, 328 U.S. 640, 643, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946); Castro v. United States, 5 Cir., 1961, 296 F.2d 540; Walker v. United States, 5 Cir., 1965, 342 F.2d 22; United States v. Jasso, 5 Cir., 1971, 442 F.2d 1054. It is only an identity of offenses which is fatal. *See* Pinkerton v. United States, *supra,* 328 U.S. at 644, 66 S.Ct. at 1182.

■ The evidence in this case was sufficient for the jury to have reasonably inferred two separate offenses. Knight knew that Toombs had heroin for sale. He so informed Agent Dean and directed him to a location where Toombs could be found. As far as Knight knew, Dean in his undercover capacity was simply another purchaser. A reasonable inference of conspiracy is deduced from the following sequence of events: Knight's meeting with Toombs at the rear of the shop for the prior announced purpose of acquiring heroin for Dean; the entering by Toombs and Knight of defendant's vehicle where they conversed for a short time; and finally, Knight's information to Dean that the heroin was available for sale imme-

---

6. See n. 1, *supra.*

7. Our conclusion is not related to or influenced by the untimeliness of appellant's motion.

diately following that conversation. The transfer of money and heroin between Knight (acting as a conduit for Dean) and Toombs subsequent to their conversation constituted evidence of the actual distribution. Under these circumstances, all of the elements of a conspiracy were present.

Affirmed.