UNITED STATES of America,
Plaintiff–Appellee,

v.

Pablo MOLINA–GARCIA,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Rene GARCIA–GARCIA, Sr.,
Defendant–Appellant.

Nos. 79–5635, 79–5636.

United States Court of Appeals,
Fifth Circuit.
Unit A

Jan. 12, 1981.

Robert R. Harris, El Paso, Tex., for defendants–appellants.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., Michael S. McDonald, Asst. U. S. Atty., El Paso, Tex., for U. S.

Before INGRAHAM, GEE and TATE, Circuit Judges.

INGRAHAM, Circuit Judge:

This is a consolidated appeal from separate criminal convictions. After severance, defendants Pablo Molina–Garcia (hereafter Molina) and Rene Garcia–Garcia (hereafter Garcia) each were convicted of conspiracy to possess marijuana with intent to distribute in .violation of 21 U.S.C. §§ 846, 841(a)(1) and of the substantive offense of possession with intent to distribute same in violation of 21 U.S.C. § 841(a)(1). From his jury trial, Molina appeals on two grounds: error in failing to suppress evidence obtained from a house pursuant to an allegedly invalid search warrant, as well as evidence seized from a van parked at the house but not specifically mentioned in the warrant; and insufficiency of evidence to support the jury verdict. From his trial to the court, Garcia complains of the failure to suppress evidence obtained from the house and van, asserting as does Molina the invalidity of the search warrant. We affirm both convictions.

■ As proponents of a motion to suppress, Molina and Garcia had the burden of establishing that their own Fourth Amendment rights were violated by the challenged searches. *See Rakas v. Illinois*, 439 U.S. 128, 130–31 n.1, 99 S.Ct. 421, 423–424 n.1, 58 L.Ed.2d 387 (1978).[1] Far short of meeting this burden, they made no attempt whatsoever to assert any interest in the searched house or van or in the seized contraband, nor in any other way attempted to establish the requisite legitimate expectation of privacy in the house or van. *See also id.* at 148, 99 S.Ct. at 433. Since Molina and Garcia never established their personal right to challenge the searches at issue here, we need not reach the further question whether those searches were supported by valid warrant or probable cause.[2]

■ Molina asserts the further ground of insufficiency of the evidence to sustain his conviction. When a defendant attacks a jury verdict as resting on insufficient evidence, our standard of review is to examine the evidence, and all reasonable inferences that may be drawn therefrom, in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The test for sufficiency is the same whether the evidence is direct or circumstantial. *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). We can reverse only if we conclude

1. *See also United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). In *Salvucci*, the defendants relied on automatic standing and did not attempt to establish that they had a legitimate expectation of privacy in the areas searched. The Supreme Court remanded the case so that they would have an opportunity to demonstrate that their own Fourth Amendment rights were violated. The defendants in *Salvucci* did not have the benefit of the Court's opinion in *Rakas* at the time of their suppression hearing. Molina and Garcia, however, argued their motion to suppress over one–half year after the decision in *Rakas*. We therefore believe a remand is inappropriate in this case. *See Rawlings, supra*, at ——, 100 S.Ct. at 2562 (1980).

2. Even were we to examine the validity of the warrant or, adopting *arguendo* the theory that the van search was a separate and second search, the presence of probable cause to conduct that second search, the outcome would be no different in this case. Interpreting the supporting affidavit in a common–sense and realistic fashion, not with a grudging or negative attitude or in a hypertechnical manner, *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–746, 13 L.Ed.2d 684 (1965), there was ample information contained in the affidavit, *Aguilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 1511 n.1, 12 L.Ed.2d 723 (1964), from which the magistrate could find probable cause to issue the search warrant. Furthermore, if independent probable cause were necessary in order permissibly to search the van, the discovery of 200 pounds of marijuana in the house, the presence of the van in the driveway of the residence, the visibility of the bagged half–ton of marijuana through the van windows, and the strong odor of marijuana around the van, all would lead us to affirm the district court's refusal to exclude the fruits of the van search.

that a reasonable jury could not find the evidence inconsistent with all reasonable hypotheses of the defendant's innocence. *United States v. Lichenstein*, 610 F.2d 1272 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). The proof, whether direct or circumstantial, must establish beyond a reasonable doubt that a conspiracy existed between knowing partners. *United States v. Michel*, 588 F.2d 986 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). For a conspiracy under 21 U.S.C. § 846, there is no requirement that the government allege or prove any overt acts. *United States v. Palacios*, 556 F.2d 1359 (5th Cir. 1977). With these principles in mind, we turn now to an examination of the government's evidence against Molina adduced at trial.

On or about May 1, 1979, El Paso Police Department Officer James M. Omohundro began periodic surveillance of a house located at 1716 Robert Wynn, El Paso, Texas, in response to information received from a confidential informant. Officer Omohundro observed defendant Molina there at that time. Molina was getting into a brown pickup truck with a white camper top, bearing Mexican license plates. During the last third of May 1979, Officer Omohundro drove by the house three times daily—once each in the morning, afternoon, and evening. The brown pickup truck usually was there in the morning and evening and sometimes in the afternoon. On various occasions, Omohundro observed Molina driving, getting into, or getting out of the brown truck. During the entire one and one–half months of surveillance, Omohundro observed only Molina driving that truck.

On June 7, 1979, Omohundro saw another truck backed into the garage of the Robert Wynn house. Unidentified individuals were loading or unloading large green plastic bags into or from the back of the truck. The bags were sealed at the top with tape. On or about June 10, 1979, Omohundro saw a dark colored van at the house. He had seen this van on several previous occasions parked in the driveway. This time, however, the van was backed into the garage. The garage door was partially closed, but the nose of the van protruded beyond the doorway. On or about June 13, 1979, Omohundro drove by the house and saw another truck backed into the garage. Unidentified Mexican [3] males were loading or unloading large green bags, taped at the top, at the back of the truck. This truck bore the New Mexico roadrunner symbol in the usual position of a front license plate.

On one occasion in early June 1979, Omohundro drove by the house and saw the garage and house doors wide open. He also saw Molina inside the house at this time. On all previous occasions, except when a truck was backed into the garage, the house had been closed up tightly.

In the afternoon of June 13, 1979, after Officer Omohundro had earlier seen the truck loading activity, El Paso Police Department Detective Walter Mollier, on assignment to the Drug Enforcement Administration Task Force, joined Omohundro at the stakeout. As Mollier and Omohundro watched, the curtains would part as though to allow someone to peek out and then the curtains would close again. Between 6:40 p. m. and 7:00 p. m., Molina and Garcia arrived in the brown pickup truck. They got out and went inside. Approximately twenty minutes later, Molina came outside with a small paper sack. He looked up and down the street, then looked across the street, and then looked up and down the street again. He walked to the truck, unlocked the tool compartment, placed the paper bag inside, and relocked the compartment. He started back to the house, paused to look up and down the street again, and then went inside. A few minutes later, Molina and Garcia and an unidentified Mexican male exited the house, got in the truck and departed.

Early in the morning of June 14, 1979, armed with a search warrant secured the previous evening, Mollier, Omohundro, and other members of the El Paso Police De-

---

3. The term used in the testimony.

partment and D.E.A. Task Force reestablished surveillance of the house. At approximately 1:00 p. m., Garcia arrived in a taxicab and went inside. Five minutes later, Molina arrived in the brown pickup truck and went inside. Approximately twenty minutes later, Molina came out of the house, got into the brown pickup, and left. Detective Mollier then ordered the officers to execute the search warrant issued for the premises and garage located at 1716 Robert Wynn, El Paso, Texas.[4]

Upon entering the house, the first thing the officers noticed was a strong odor of marijuana. The house was very sparsely furnished. There was no furniture in one bedroom and only a chair in another. The third bedroom contained only a bed and a chest of drawers. The living room contained only a couch, one chair, and a television set. There were two shirts and one pair of pants in the hall closet. There were no clothes in any of the other closets.

Behind a bedroom door secured by a deadbolt lock, the officers found 200 pounds of marijuana in plastic and burlap bags. In the closet of that bedroom, in addition to a paper bag containing more marijuana, they found a fifty–pound weighing scale, a hundred–pound weighing scale, boxes of large plastic garbage bags, and a roll of heavy–duty sealing tape. Also in that bedroom they found a vacuum cleaner containing approximately one pound of marijuana sweepings. In a kitchen cabinet, the officers found yet another large plastic garbage bag containing marijuana. On Garcia, the officers found keys to the front door of the house and to the deadbolt lock on the bedroom door.[5]

After the initial search of the house, some of the officers departed the scene while others secreted themselves in the house awaiting further developments. Subsequently, an unidentified driver parked the dark–colored van in the driveway. Rather than entering the house, he immediately departed in a trailing automobile. A large quantity of marijuana had been bundled and loaded in the back of the van in such a way that it could be seen from any of the windows. While the van was still in the driveway and before the officers had removed its contents, two more men came to the house and were arrested. On one of them, officers found a key to the van. Upon examination, the officers discovered that the van contained another 1200 pounds of marijuana.

Viewing the foregoing evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, we find that the jury reasonably could have concluded that the house at 1716 Robert Wynn was a stash house for the wholesale distribution of marijuana; that on at least one occasion the house was being aired out to reduce the strong odor of marijuana present inside; that the floors of the house had been vacuumed to pick up marijuana droppings left behind after handling; that Molina and Garcia were custodians of the drug warehouse; that both of them were actively and knowingly involved in a conspiracy to possess marijuana, with intent to distribute same, during the period alleged in the indictment; and that both of them were knowingly and intentionally in joint constructive possession of marijuana, with intent to distribute same, on June 14, 1979, as alleged in the indictment. We therefore reject Molina's argument that the verdict rests on insufficient evidence and affirm the convictions of Pablo Molina–Garcia and Rene Garcia–Garcia.

AFFIRMED.

4. Also at this time, Detective Mollier ordered the immediate arrest of the departing Molina at a point out of sight from the house. At a suppression hearing, the district court ruled that Molina's arrest was without probable cause, having occurred before the discovery of the marijuana in the house, and therefore held inadmissible evidence of his arrest, of items found on his person and in his truck, and of the officers' transportation of Molina back to the house after his arrest.

5. Two of the items suppressed by the district court were keys found in Molina's pocket that also fit the front door and the deadbolt lock. The court additionally suppressed evidence of marijuana residue found in Molina's truck.

TATE, Circuit Judge, concurring:

I am reluctant to hold, as the majority does, that the defendants did not have a legitimate expectation of privacy in the residence searched and, therefore, lacked standing to assert that evidence was seized as the result of an unconstitutional search. I concur, however, because the evidence was seized as the result of a valid search.

*Rakas* does seem to hold, as the majority states, that, to raise Fourth Amendment grounds contesting the validity of a search an accused must assert a property or a possessory interest in the property searched or at least a legitimate expectation of privacy with regard thereto. A majority of the Supreme Court extended this ruling, last term, to prevent even an accused charged with criminal possession of the evidence thereby seized from claiming the protection of the Fourth Amendment in the absence of a legitimate expectation of privacy in the area searched. *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

I do not, however, read these decisions as stating that the defendants must formally take the stand at a suppression hearing in order formally to claim a possessory interest in the contraband that they are charged with criminally possessing, or in the premises that they are charged with occupying as a stash house (warehouse for drugs) as part of a criminal conspiracy. It seems to me self–evident that persons such as the defendants who occupy a residence for (at the least) six weeks, as the government's evidence shows, have a legitimate expectation of privacy in those premises–that the government cannot, without violating the Fourth Amendment, arbitrarily search those premises, without probable cause and either a warrant or exigent circumstances. The protection of individuals under the American constitution against unreasonable and warrantless searches and seizures of the premises they occupy does not desert them if they do not own or have a leasehold interest in the property, and I do not believe that *Rakas* (passenger in someone else's automobile), *Salvucci* (apartment of the mother of one of the defendants), or *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (purse of companion) intended to erode the constitutional protection of traditional American privacy rights in premises actually occupied by defendants, as in the case now before us.

*Rakas* and its progeny intended to deprive a criminally accused of standing to attack the unconstitutionality of a search and seizure only when he himself was not the possessor or owner of the property searched. Here, the defendants had certainly possessed (occupied) the premises for several weeks. They thus had standing to contest an unconstitutional search. They were not bystanders, visitors, or absentees from the scene, without ownership or possessory interest in the property search–such as those in *Rakas* et al., who were therefore held to lack standing.

I am reinforced in this view by the Court's summary of the applicable principles in *United States v. Payner*, —— U.S. –– ––, ––––, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980) (holding the accused had no standing to contest search of a third person's briefcase):

> This Court discussed the doctrine of "standing to invoke the [Fourth Amendment] exclusionary rule" in some detail last Term. *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 427–428, 58 L.Ed.2d 387 (1978). We reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. *Id.*, at 133–140, 99 S.Ct., at 425–429. See, e. g., *Brown v. United States*, 411 U.S. 223, 229–230, 93 S.Ct. 1565, 1569–70, 36 L.Ed.2d 208 (1973); *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969); *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968). And the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third

party. *Rakas v. Illinois, supra,* 439 U.S., at 143, 99 S.Ct., at 430; *id.,* at 149–152, 99 S.Ct., at 433–435 (POWELL, J., concurring); *Combs v. United States,* 408 U.S. 224, 227, 92 S.Ct. 2284, 2286, 33 L.Ed.2d 308 (1972); *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968).

I concur, rather than dissent, however, because I do not find reversible merit presented by the sole attack made by the defendants upon the validity of the search of the residence: that the affidavit was insufficient under *Aguilar–Spinelli* standards.[1]

---

1. As to the evidence seized from the van, pretermitting the *Rakas* issue, it was obtained as a result of the plain view exception to the warrant requirement.