**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Rebecca Lynn ROBERTSON,**
**Defendant-Appellant.**

**No. 80–1991.**

United States Court of Appeals,
Fifth Circuit.*
Unit A

Oct. 21, 1981.
Rehearing and Rehearing En Banc
Denied Dec. 11, 1981.

Charles S. Szekely, Jr., Asst. Federal Public Defender, Roland E. Dahlin, II, Federal Public Defender, Houston, Tex., for defendant-appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before CHARLES CLARK, TATE and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

On August 28, 1979, a grand jury in Brownsville, Texas returned a three-count indictment against defendant Rebecca Lynn Robertson and two co-defendants. The first count of the indictment charged defendant with conspiracy to possess marijuana with intent to distribute it in violation of 21 U.S.C.A. §§ 841(a)(1) and 846. The second count charged defendant with possession of marijuana with intent to distribute it in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. The third count charged defendant with using a communications facility during the commission of a felony in violation of 21 U.S.C.A. § 843(b) and 18 U.S.C.A. § 2.

Defendant was arraigned and pled not guilty to all three counts. After a trial by jury, the district court granted defendant's motion for a judgment of acquittal as to

count three of the indictment. The jury found defendant not guilty of count two. However, the jury found defendant guilty of count one, the conspiracy charge, and defendant was sentenced under the Youth Corrections Act to five years probation with supervision.

Defendant appeals her conviction, claiming there is insufficient evidence to support the jury's finding. She also claims the district court erred in its manner of charging the jury. We affirm defendant's conviction.

## I. Facts

When reviewing a record to determine whether sufficient evidence exists to uphold the jury's verdict, we must view all the evidence in the light most favorable to the Government, accepting all reasonable inferences and credibility choices tending to support the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981). "We can reverse only if we conclude that a reasonable jury could not find the evidence inconsistent with all reasonable hypotheses of the defendant's innocence." *United States v. Molina-Garcia*, 634 F.2d 217, 218–19 (5th Cir. 1981). The facts viewed in the light most favorable to the government demonstrate defendant was guilty of conspiracy to possess marijuana with intent to distribute it.

### A. Knowledge of the Conspiracy

Co-defendant Randy Mitchum, the Government's principle witness, began transporting marijuana from the Rio Grande Valley of Texas to Conroe, Texas—a town approximately forty miles north of Houston—several months preceding his arrest and the arrest of defendant Rebecca Lynn Robertson.[1] Mitchum worked for a man named Nick Gonzalez, defendant's step-father. Gonzalez' home in Conroe was the apparent headquarters of a significant marijuana distribution scheme.

Defendant's participation in the conspiracy first began on Friday, August 10, 1980. On this Friday, Nick Gonzalez, Mitchum, and defendant discussed an upcoming trip to the Valley for the purpose of obtaining marijuana. Gonzalez told those present—including defendant Rebecca Lynn Robertson—that they were going to the Valley in order to obtain the second half of a load of marijuana. Defendant was told the first half already had been brought to Conroe and it was "sin semilla," which means the marijuana was seedless or Grade A.

It apparently was during this conversation that the parties discussed the mechanical aspects of the trip to the Valley. The second half of the marijuana load was to be transported in a blue Ford camper pickup, which would be driven by Mitchum. Defendant and co-defendant Andrea Sue Robertson would occupy a second car, a black 1979 Firebird. The Firebird would serve as a "scout" car. It would drive ahead of the pickup in order to assure the illegal activity would not be detected. Both vehicles were equipped with citizen band radios to facilitate communication between the scout car and the pickup.

### B. The Trip to the Valley

The caravan left the Houston area late in the evening of Saturday, August 11. The pickup truck was occupied by Mitchum and the younger half brother of defendant, Randy Hooker. The scout car was occupied by co-defendant Andrea Robertson, defendant's four-year old sister, defendant's twelve-month old daughter, and defendant herself. The record indicates defendant voluntarily assumed her position in the passenger side of the car's front seat, she knew the car was intended to serve as a scout car, and she knew the sole and express purpose of the trip to the Valley was to obtain marijuana for distribution in the Houston area.

---

1. Defendant's sister, Andrea Sue Robertson, was the third co-defendant. She is presently a fugitive and has not been tried.

After arriving in Brownsville, Texas, the six-member group checked into a motel. Co-defendants Mitchum and Andrea Robertson then left in order to make contact with the supplier of the marijuana, leaving defendant at the motel with Randy Hooker and the two small children. After failing to make contact with their source, Andrea Robertson and Mitchum returned to the motel and the group checked out, later checking into a second motel.

Once again, Andrea and Mitchum left the motel to make contact with their source. As before, defendant was left at the motel room with her younger half brother and the two small children. On this occasion, Andrea and Mitchum made contact with their source and transacted their business.

After the pickup truck was loaded with marijuana on Sunday morning, the return trip to Conroe was discussed. Defendant was present throughout the discussion. It was decided the convoy would utilize Farm to Market Road 1017, traveling north through the LaGloria checkpoint. This decision was made because the LaGloria checkpoint, as opposed to the checkpoints on the other possible routes to Conroe, usually was not open. In addition, since the C.B. radios were not operating, it was decided the scout car, which was to be occupied again by Andrea, the two children, and defendant, would drive through the checkpoint to see if it was open. If it was not open, the car was to continue on its trip to Conroe. If it was open, the scout car was to return and warn the truck loaded with marijuana, which would be trailing eight or nine miles behind.

As the convoy left the motel on its way to Conroe, the record indicates defendant voluntarily assumed her position in the scout car. She knew the pickup truck was loaded with marijuana and would be following. She also knew the car in which she was riding was to serve as a mechanism for determining whether it was safe to transport the marijuana to Conroe.

The LaGloria checkpoint happened to be open the day of the return trip to Conroe—August 12, 1979. The record indicates the scout car containing defendant reached the checkpoint, drove a few miles down the road, turned around, and began returning to warn the passengers of the pickup truck. However, the pickup truck arrived at the checkpoint before the scout car had time to return. The Border Patrol searched the pickup and found the marijuana.

While the Border Patrol was dealing with the pickup truck loaded with marijuana and its passengers, the scout car returned to the checkpoint. Of course, this time it was heading south. The Firebird stopped, although automobiles heading south are not required to do so, and the occupants began explaining why they were returning. The record indicates defendant, together with her sister, told the Border Patrol that defendant had left her billfold in LaGloria. While explaining that defendant's identification had been lost, defendant rummaged through her purse as though she in fact had lost something.

After acting out this facade, Andrea and defendant proceeded through the checkpoint, returning once again after approximately ten minutes. Because the distance from the checkpoint to the City of LaGloria would preclude a mere ten minute trip, the Border Patrol became suspicious about the Firebird. The car was detained while the Border Patrol checked its registration, and it was identified as a stolen vehicle. The occupants of the car were held while Drug Enforcement Administration officials were summoned.

In response to questioning, defendant told the DEA agent in charge of the case she did not know the occupants of the pickup in which Mitchum and her half brother Randy Hooker had been riding. The fact is defendant knew her brother and had known Mitchum for several years. She also repeated the story about her lost identification, and told the officers she had retrieved it. Investigation revealed the store in which she claimed she had something to eat or drink was actually closed. In addition, the officer's investigation revealed that the outdoors area in which she claims she relieved herself by going to the bathroom was

quite open and exposed to view. In fact, it was visible to anyone who might be in one of two separate houses and anyone who would have been in the store if it had been open.

In addition to telling the officer she did not know her half brother or Mitchum and the fabricated story about losing her identification, defendant provided false information regarding her employment, her married name, and her phone number. She also told a fabricated story about her purpose for being in the Firebird. Defendant told the DEA officer she had gone to Harlingen, Texas to visit some friends of her sister Andrea. However, she was unable to relate the names or address of these people. Additionally, the record indicates that if in fact defendant were proceeding from Harlingen to Conroe, she had chosen to take the longest route available.

Sixteen days after the incident at the checkpoint, August 28, 1979, the grand jury returned an indictment against defendant. On that same day, a magistrate issued a bench warrant for her arrest.

## II. *Sufficiency of the Evidence*

■ One may be convicted of conspiracy even though the Government fails to prove an explicit or formal agreement to establish the conspiracy. *Norfolk Monument Co. v. Woodlawn Memorial Gardens*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *United States v. Toombs*, 497 F.2d 88, 94 (5th Cir. 1974). The conspiracy's existence can be inferred from the facts and circumstances of a particular case. *Iannelli v. United States*, 420 U.S. 770, 777 n.10, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975).

■ Additionally, "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *Marx*, 635 F.2d at 439. "The defendant's assent to a conspiracy may be inferred from acts that further the purpose of the conspiracy."

*Marx*, 635 F.2d at 439. These acts need not have occurred at the conspiracy's genesis. *United States v. Leach*, 613 F.2d 1295, 1299 (5th Cir. 1980). A defendant cannot escape criminal responsibility simply because she did not participate in the conspiracy until well after its inception. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980). It is clear from the circumstances outlined above that the jury could infer the existence of a conspiracy and Rebecca Lynn Robertson's participation in that conspiracy.

The record demonstrates Rebecca Lynn Robertson had full knowledge of the conspiracy. She was present during a discussion that not only detailed the scheme for acquiring the marijuana, but also described the success of previous acquisitions. It was with this complete knowledge that she freely and voluntarily placed herself in the center of the conspiracy. She assumed a position in the "scout" car, which was equipped for the purpose of warning the other conspirators of any potential detection. She was present throughout the acquisition of the marijuana and the planning of the return to Conroe. She again voluntarily assumed her position in the scout car, knowing the car's sole purpose was to help the pickup with a load of marijuana avoid the authorities. Rebecca Lynn Robertson never attempted to extricate herself from her position. She chose to remain surrounded by an active conspiracy to obtain marijuana.

■ Of course, evidence of a "mere knowing presence" is insufficient to convict a person of participation in a conspiracy. However, the record indicates defendant was more than merely present. The evidence demonstrates that when the scout car returned to the checkpoint on its way south to warn the load truck, defendant attempted to help decrease suspicion by offering an explanation for the scout car's return. Even if we were to assume the jury could not have inferred any conspiratorial participation by defendant prior to this time, once she reached the checkpoint, she clearly lent herself to the furtherance of the conspir-

acy.[2] Had she merely sat passively while Andrea Robertson explained "the passenger" had lost her identification, defendant would have participated in the conspiracy.

The evidence is stronger in this case, however. Defendant actively participated by talking to the Border Patrol about her allegedly lost identification. In addition, she rummaged through her purse in order to help create the appropriate image. Defendant knowingly and voluntarily agreed to aid her fellow conspirators by creating the impression there were two women traveling together, along with two small children, who needed to return to LaGloria to retrieve a lost billfold. Her actions were meant to divert attention from the possibility the car she occupied was a scout car on a marijuana run.

■ Even beyond this active participation in the conspiracy, defendant's actions provided the jury with a sufficient basis for inferring she agreed to take part in the conspiracy. In addition to her activity at the checkpoint, the number of falsehoods told by defendant after being detained by DEA agents evidenced a guilty mind. She never claimed, as she did at trial, to have been merely present. Instead, she fabricated stories about not knowing her half brother and Randy Mitchum, about her marital status, and about having lost her identification. She exacerbated the problem by leading the DEA officers on a wild goose chase to a closed store in LaGloria. "It is proper to show that an alleged conspirator lied in order to prove consciousness of guilt, even if the lie does not constitute a part of the conspiracy." *United States v. Green*, 594 F.2d 1227, 1230 (9th Cir. 1979). In addition, a person's efforts to assist in the concealment of a conspiracy may help support an inference that an alleged conspirator had joined the conspiracy while it was still in operation. *United States v. Freeman*, 498 F.2d 569, 576 (2nd Cir. 1974).

Beyond defendant's falsehoods and play acting, both before and after apprehension, there is sufficient evidence to support the jury's inference that she participated in the conspiracy. The jury reasonably could have inferred that she was a passenger in the scout car for the purpose of serving as the car's "voice." The vehicle was equipped with a C.B. radio. Mitchum was to communicate with the scout car by utilizing the C.B. Since defendant knew the radios were in the vehicles, and knew the reason they were in the vehicles, the jury could have inferred that Andrea Robertson was to drive the car and that defendant Rebecca Lynn Robertson was to talk to Mitchum.

In addition, the jury reasonably could have inferred that defendant participated in the conspiracy by serving as a baby-sitter. While in the Valley, Andrea Robertson and Mitchum had to leave the motel twice in order to contact their source. However, when they were carrying out their part of the plan, there was a need for someone to watch the two small children that had been brought along. Of course, defendant was an ideal choice for baby-sitter. She was the older sister of one of the children, and she was the mother of the other child.

2. It is unclear from the record whether the principal objective of the conspiracy—possessing marijuana with the intent to distribute it—had been thwarted. It is clear the Border Patrol had stopped the load truck. It might be argued that control of the pickup and, therefore, control of the substantive element of the conspiracy, the marijuana, would have made it impossible for a party to become a new member of the conspiracy, since the conspiracy had terminated. At most, the argument might continue, a party could participate in the furtherance of a conspiracy to cover up the original plan or protect participants of the original plan.

We are bound, however, to read the record in the light most favorable to the Government.

There is no indication defendant knew the object of the conspiracy had become impossible. Since a "culpable conspiracy may exist even though, because of the misapprehension of the conspirators as to certain facts, the substantive crime that is the object of the conspiracy may be impossible to commit," *United States v. Waldron*, 590 F.2d 33, 34 (1st Cir.), *cert. denied*, 441 U.S. 934, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Katz*, 601 F.2d 66, 68 (2nd Cir. 1979), any actions taken by a person to achieve the goals of a conspiracy believed to be still in existence would be participating in the conspiracy.

The jury also could have inferred a number of other means of participation by defendant. She could have been along to help with the car if there were problems, serve as an alternate driver, or merely serve as a lookout while the driver watched the road. Additionally, it cannot be ruled out that her mere presence may have been part of the scheme. The jury could have concluded that two women traveling together with two small children was meant to help reduce suspicion. If stopped and questioned, the passenger could have said she was traveling with her sister to visit friends and she came along because she did not want her sister driving from Houston to Harlingen by herself. This does not appear to be an implausible inference since the sisters did fabricate a story about visiting friends in Harlingen.

When we review the record as a whole, and in a light most favorable to the Government, there is no doubt that there is sufficient evidence to support the jury's finding that defendant was guilty of conspiring to possess marijuana with intent to distribute it.

## II. *The Charge*

Defendant argues the trial judge committed reversible error in charging the jury as to the law applicable to the facts of this case. In addition, defendant claims that a supplemental instruction given by the judge amounted to reversible error. However, we hold that if error was committed, it did not harm defendant.

### A. *The Initial Charge*

Defendant claims the trial judge erred in his initial charge to the jury in three ways. First, defendant claims error in the judge's failure to charge the jury that when determining whether she was a member of the conspiracy, it should consider only her individual acts and statements and not the acts and statements of others. Second, defendant claims the judge charged the jury that mere presence can support a conviction in a conspiracy count. Finally, defendant claims the judge did not fairly apprise her attorney of what he was going to charge and, therefore, violated Rule 30 of the Federal Rules of Criminal Procedure.

■ Regarding defendant's first argument, we can conceive of a case in which it would be necessary to charge the jury that in determining defendant's membership in a conspiracy, it should consider only the evidence, if any, pertaining to defendant's own actions and statements. However, the absence of such a charge in this case is understandable. As has been discussed, the record contains a substantial amount of evidence demonstrating informed and voluntary activity by defendant sufficient to allow the jury to infer active participation in the conspiracy. This case does not exhibit a situation in which the record is so effectively devoid of evidence of any activity by defendant that in order to find membership on her part, the jury would have to rely on the acts and statements of others. The omission of the requested addition to the trial judge's charge—if error at all—was harmless.

In addition, we do not find the trial judge charged the jury that mere presence can support a conspiracy conviction. The judge charged the jury:

Now, the mere fact that someone is present during some part of a conspiracy or the fact that somebody knows about the conspiracy does not make them members of the conspiracy if they were innocently there and were not a part of it.

. . . . .

On the other hand, if it was part of the conspiracy that she be present and that her presence alone was part of a subterfuge to reduce suspicion . . . and you believe the other elements as I've explained them to you . . . then she would be guilty . . . .

On the other hand, if her presence was not there for that purpose . . . then it would be your duty under the law to find her not guilty.

Record, vol. 3, at 369–71.

■ It is defendant's position that the court's comments regarding her presence

being a part of the plan violated the basic law of conspiracy—that mere presence is insufficient to prove participation in a conspiracy. However, the charge must be read as a whole. *Davis v. McAllister*, 631 F.2d 1256, 1260 (5th Cir. 1980). The trial judge specifically instructed the jury that "the mere fact someone is present . . . doesn't make them members of the conspiracy." This statement of the law immediately preceeded his comment regarding the way presence could amount to a part of the plan. Immediately following his allegedly erroneous comment, he again admonished the jury that if it finds she was not there for the purpose of subterfuge, then it had a duty to acquit her. When the charge is read as a whole, it becomes clear the judge did charge the jury properly regarding a person's mere presence.[3]

We also find the trial judge substantially complied with Rule 30 of the Federal Rules of Criminal Procedure. Rule 30 allows a party to file written requests that the court instruct the jury on the law as set forth in the requests. The rule requires the court to inform counsel of its proposed action regarding the requests. *United States v. Clarke*, 468 F.2d 890, 891–92 (5th Cir. 1972). The judge did inform counsel of its proposed action. He specifically informed defendant's counsel he would charge on the presumption of innocence, reasonable doubt, the difference between direct and circumstantial evidence, and a basic charge on conspiracy. He also informed counsel that, as to those instructions not overruled completely, his charge would contain the same substance as the issues requested by counsel, but the form would be different. In fact, that was the ultimate result. Since this Court requires that there be only sub-

stantial compliance with Rule 30, *United States v. Jones*, 642 F.2d 909, 915 (5th Cir. 1981); *United States v. Mendoza*, 473 F.2d 697, 701 (5th Cir. 1973), we find no reversible error in the judge's action.

### B. *The Supplemental Instruction*

Defendant argues the trial judge committed reversible error by giving a supplemental jury instruction. The court gave a supplemental instruction in response to a request by the jury foreman indicating there was confusion concerning the difference between the conspiracy count of the indictment and the substantive count. Defendant claims the court's instruction "capsulated" all the elements contained in the two counts of the indictment into a new charge. She contends the instruction deleted all previous balancing instructions.

We find, however, that the court did not give a new charge requiring balancing instructions. The judge simply clarified, through example, the difference between conspiring to possess marijuana and actually possessing the illegal substance. While the law of conspiracy was distilled into a rather simplistic form, it was meant only to answer the jury's question. The judge explained the conspiracy count charged a plan to violate the law, and the substantive count charged that the plan actually was put into effect. In explaining his reference to a "plan," he used two examples. In the first example, the judge described three men who "agreed" to break the law. In the second example, the judge explained that if he first planned to shoot someone and then went out and hired someone to shoot the person, he was guilty of conspiring to kill somebody. There is no reason to believe the jury was misled into

---

**3.** In addition, it cannot be said that the judge's comment regarding defendant's presence was unfair and "created" the crime in the jury's mind. First, the record indicates that if anyone planted a seed in the jury's mind, it was the prosecuting attorney in his closing argument. He explained and argued to the jury that the circumstantial evidence clearly pointed to a conclusion that defendant was present to decrease suspicion. As such, he argued she was a member of the conspiracy. Second, the jury could have inferred participation by defendant in a number of ways other than mere presence for the purpose of reducing suspicion. The jury reasonably could have found the defendant participated by serving as the voice of the scout car, as a baby-sitter, or in the other ways previously described. Of course, defendant's active participation at the checkpoint also could have led the jury to believe defendant was more than merely present.

believing the judge's original charge regarding the requirements of the law was superseded, and there is no reason to believe defendant was harmed in any way.

Since defendant's claims do not constitute reversible error, her conviction is

AFFIRMED.