**UNITED STATES of America,
Plaintiff-Appellee**

v.

**David Guy KELLER,
Defendant-Appellant.**

No. 85–2324.

United States Court of Appeals,
Fifth Circuit.

March 20, 1986.

---

Sheila C. Myers, New Orleans, La., for defendant-appellant.

David Guy Keller, Walker, La., pro se.

Julia Ann Bowen, Atty., Appellate Section, Crim. Div., Washington, D.C., Henry K. Oncken, U.S. Atty., Susan L. Yarbrough, James R. Gough, Asst. U.S. Attys., Houston, Tex., Kathleen A. Felton, Atty., Appellate Section, Crim. Div., Washington, D.C., for appellee.

Before RANDALL and WILLIAMS, Circuit Judges, and BOYLE [*], District Judge.

JERRE S. WILLIAMS, Circuit Judge:

David Guy Keller appeals from his conviction on one count of conspiracy to commit wire fraud, 18 U.S.C. §§ 371 and 1343. His sole contention is that the evidence is insufficient to support his conviction.

## I. FACTS

In March of 1983, Jimmy Keller, appellant's father, set up a cancer clinic, Universal Health Center (UHC), in Matamoros, Mexico, and Brownsville, Texas. Jimmy Keller was not a medical doctor. The basic treatment administered at the UHC consisted of fourteen injections of Tumorex [1] during a two week period. This treatment cost $2,900 to $3,000. Before a patient was given any Tumorex, Jimmy Keller or his brother, Ron Keller, would make a diagnosis using a machine they called the digi-

tron. The patient would hold onto a white square plate attached to the digitron with two wires. The operator would hold a pendulum in his right hand [2] and swing it over the machine. The swinging pendulum was supposed to help the operator fine tune the digitron. The digitron then purportedly diagnosed how much malignancy the patient had. Then the operator would put the Tumorex on the other side of the machine and swing the pendulum in order to determine how much Tumorex was needed to treat the patient. The patient would be reconnected to the digitron once a day while he or she received the Tumorex treatment. Sometime before the end of the treatment, the patient would be told that the digitron showed the malignancy level in his or her body to be zero.

In addition to the Tumorex and the digitron, the treatment consisted of a complex diet, colonic irrigations, and lymphatic massages. The theory was that Tumorex killed the cancer cells, and the diet, enemas, and massages helped rid the body of the dead cancer cells. Some patients were told to rub their feet with castor oil and put on white cotton socks in order to draw out dead cancer cells.[3] Expert testimony thoroughly discredited Keller's method of treating cancer.

Patients were referred to the clinic by Maxine Lowder who earned $500 per patient. Lowder was set up in Salt Lake City, Utah as Western Health Research (WHR). Potential patients telephoned WHR, and Lowder would give them information about UHC and make reservations. She told them that patients who had previously undergone radiation therapy had about a 60 percent rate of recovery with Tumorex, and that those who had not undergone radiation had about an 80 to 90

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

1. Tumorex consists of one amino acid, L-Argenine, and bacteriostatic water.

2. Jimmy Keller told patients that the machine's reading would be inaccurate if he used his left hand because "good energy flows in through the right hand and out through the left."

3. The digitron was also used to treat patients long distance. The operator of the digitron placed a Polaroid picture of the patient in the machine. The theory was that pictures had energy and the digitron would put its energy into the picture which would be transmitted to the patients long distance.

percent rate of recovery. In fact, about 85 percent of the patients treated with Tumorex eventually died of cancer.

Appellant is implicated in his father's and uncle's scheme by the testimony of Nora Dominguez and Mrs. Judith Kindred. Dominguez, an investigator for the Consumer Protection Division of the Texas Attorney General's Office, posed as the parent of a ten-year-old child who had acute lymphocytic leukemia. On December 1, 1983, she contacted Lowder and told her about her son's condition. Lowder told her that the UHC would cure her son, and there was an 80 to 85 percent chance her son would be cured before Christmas. Through Lowder, Dominguez made an appointment for December 7, 1983, to visit the clinic. Dominguez was told that she should go to apartment P–301 of the Amigoland apartment complex in Brownsville. Appellant and his wife shared this apartment with Jimmy Keller. When Dominguez went to the apartment she was greeted by appellant. She told appellant about her son's condition and asked about his father's treatment. The record contains firm testimony that appellant told her his father was treating people for cancer at the clinic in Matamoros, and that almost everyone treated at the clinic was cured of cancer. Dominguez asked appellant for more information, and he handed her a magazine containing an article and advertisement about the clinic. He told her that this article could more than adequately explain his father's cancer treatment. Dominguez asked appellant if she could keep the magazine but appellant refused. He said that the magazine was the only one left in the apartment and he needed it so he could show other people. Dominguez expressed reluctance at taking her son into Mexico for the treatment. Appellant told Dominguez that a lot of the clinic's patients stayed at Amigoland apartments, and that he believed that she could obtain treatment for her son in Brownsville.

Mrs. Kindred was the other witness implicating appellant in the conspiracy. Mr. and Mrs. Kindred visited UHC in hope that Mr. Kindred's terminal cancer could be cured.[4] On November 29, 1983, Mr. Kindred received his first injection of Tumorex. Mrs. Kindred saw appellant at the clinic talking with patients. When Mr. Kindred returned the next day, Jimmy Keller told him that he could not administer any more treatments until Mr. Kindred received some "fresh" blood in a transfusion. Mr. Kindred did have a transfusion at a hospital in McAllen, Texas. His wife then called the Amigoland complex and talked to appellant. She told him that her husband had gotten some blood, and asked when they could return to the clinic to resume treatment. Appellant told her to come to the clinic the next day.

After the midway point in Mr. Kindred's treatment he was told his malignancy was gone. Finally, on December 15, 1983, the Kindreds arrived at the clinic for the last Tumorex injection and discovered the clinic had been shut down. They returned to Amigoland apartments where they saw appellant. He told them he would take them to his father for Mr. Kindred's final treatment. He asked the Kindreds if they would drive their van and take two other patients with them. He explained that his father was hiding from authorities, and he could not take his car because this might tip off the police to where his father was staying. Appellant rode with and directed the cancer victims to his father's hotel room, and watched as his father injected the patients with Tumorex.

Appellant was indicted on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 and 1343, four related counts of wire fraud in violation of 18 U.S.C. §§ 1343 & 2. Three counts of wire fraud were dismissed during trial. Appellant was acquitted on the remaining wire fraud count but was convicted on the one count of conspiracy to commit wire fraud (use of telephone as part of conspiracy to defraud) and sentenced to four

4. He died of cancer on February 19, 1984.

years, with all but forty-five days suspended.

## II. DISCUSSION

Appellant claims that the evidence was insufficient to prove beyond a reasonable doubt that he knew of, intended to join, and participated in the conspiracy to defraud cancer victims. We must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Appellant argues that the evidence shows only that he visited with the other conspirators, he was present when activity in furtherance of the conspiracy was conducted, and he was a relative of two co-conspirators. This evidence, he contends, is not enough to sustain a conspiracy conviction, citing well-established rules that guilt of conspiracy cannot be proven solely by "mere knowing presence," *United States v. Robertson*, 659 F.2d 652, 656 (5th Cir.1981), or familial relationships. *United States v. White*, 569 F.2d 263, 268 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Guttierrez*, 559 F.2d 1278, 1280 (5th Cir.1977).

Appellant arrives at this abbreviated version of the facts by wholly disregarding the strongest evidence against him: Dominguez's testimony that he encouraged her to use his father's clinic, and the trip he made

to take patients to his father's hideout. We cannot accept appellant's evaluation of the evidence. He claims, contrary to Dominguez's testimony, he did not encourage Dominguez. Appellant in attacking the credibility of Dominguez's testimony mistakes our role. We do not re-evaluate the evidence; that is the job of the trial court. We must resolve all credibility determinations against appellant. *United States v. Villarreal*, 769 F.2d 1044, 1045 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 272, 88 L.Ed.2d 233 (1985).

■ Appellant also asks us to disregard the incident where he transported patients to his father in hiding because he did not personally profit from the trip.[5] Thus, he argues he did not have a stake in the enterprise. This argument is specious. The fact that appellant did not have a stake in the conspiracy at all, much less in one isolated event in furtherance of the conspiracy, is not determinative. The fact that an accused has a stake in an alleged conspiracy is merely relevant to establishing participation in the scheme. But it is not a requirement. *Direct Sales Co. v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943).

■ We conclude that there is more than sufficient evidence to support the jury's finding that appellant was a guilty participant in a conspiracy directed at defrauding cancer victims. "The defendant's assent to a conspiracy may be inferred from acts which further the purpose of the conspiracy." *United States v. Marx*, 635 F.2d 436, 439 (5th Cir.1981). Appellant had full knowledge of the conspiracy. He was well-versed in the clinic's operation. He talked with patients at the clinic. He watched patients receive Tumorex injections. He greeted Dominguez when she arrived in

5. Appellant also argued for the first time at oral argument that the evidence of the trip should not be considered because the conspiracy was over at that time. We cannot consider this argument since it was not raised below. *United States v. Jackson*, 700 F.2d 181, 190 (5th Cir.), 464 U.S. 842, *cert. denied*, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). In any event, the appellant's argument is based on the false premise that the existence of a conspiracy depended on the clinic being open. This is not the case. The indictment did not state that the conspiracy depended upon the existence of the clinic, but rather the existence of a scheme to defraud cancer victims between March 1, 1983 and December 20, 1983. The date of the trip was within this time period.

Brownsville, and gave her more information about the Tumorex treatment. He told her about the accommodations of the cancer victims and where the treatments could be obtained. He encouraged Dominguez to obtain treatment for her son at the clinic by telling her that almost everyone treated at the clinic was cured of cancer. He gave instructions to the Kindreds over the phone on when they should return for further treatments. After the clinic was shut down by authorities, he drove patients to his father's hideout so they could obtain further bogus Tumorex treatments, insisting that they take a car other than his own so his father would not be discovered. The fact that he strove to conceal his father's whereabouts creates a significant inference of participation. *Robertson*, 659 F.2d at 657.

Upon a thorough review of the record we conclude that the evidence established appellant's participation in the conspiracy. On the record it is clear that appellant was not convicted solely because of his father's and uncle's role in the conspiracy. The conviction of appellant, David Guy Keller, is properly affirmed.

AFFIRMED.